## UNITED STATES *v.* PHELLIS.

### APPEAL FROM THE COURT OF CLAIMS.

No. 260. Argued October 11, 1921.—Decided November 21, 1921.

1. Substance and not form should control in the application of the Sixteenth Amendment and the income tax laws enacted under it. P. 168.
2. The Income Tax Law of October 3, 1913, in declaring that the tax shall be laid on gains, profits and income derived from dividends, means, not that everything in the form of a dividend must be treated as income, but that income derived in the way of dividends shall be taxed. P. 168.
3. Income defined (p. 169) as in *Eisner* v. *Macomber*, 252 U. S. 189.
4. With the concurrence of 90% of the stockholders of a corporation, a plan of reorganization was effected, pursuant to which a new corporation with an authorized capital stock nearly four times as great in par value as the aggregate stock and bonded indebtedness of the old was formed under the laws of a different State, all the assets of the old were transferred to the new, as a going concern, including the good will and a large surplus, and, in consideration, the old corporation retained money enough to redeem part of its bonds and received (1) the new company's debenture stock of par value sufficient to redeem the remainder, retire its own preferred stock and leave in its treasury an amount equal in par value to its own outstanding common stock, and (2) the new company's common stock of par value double the amount of the old company's outstanding common stock, which the latter immediately distributed to its common stockholders as a dividend, paying them two shares of the new for each of the old. Upon completion of the transaction, October 1, 1915, the personnel of the stockholders and officers of the two corporations was identical, the stockholders having pro-

portionate holdings in each; but less than one-half of the new company's authorized stock had been issued. Thereafter, the old corporation continued as a going concern, but, except for the redemption of its bonds and retirement of its preferred stock, and the holding of the debenture stock equal to its common, and collection and disposition of the dividends thereon, did no business. *Held:* (a) The shares of the new company's common stock which passed to the old company and through it to its stockholders as a dividend, representing its surplus, were income of the shareholders, taxable under the Act of October 3, 1913. P. 169. (b) And this, although the market value of the stockholder's old shares before the dividend was the same as that of his old and new shares after it. P. 170. (c) The new company must be regarded, not as substantially identical with the old, but as a separate entity, and its stockholders as having property rights and interests materially different from those incident to ownership of stock in the old company. P. 172. (d) The new common stock in the treasury of the old company being treasury assets representing accumulated profits and capable of distribution, its distribution transferred to the several stockholders new individual property, which they were severally entitled to enjoy or to sell,—their individual income. P. 174.
56 Ct. Clms. 157, reversed.

APPEAL from a judgment sustaining a claim for a refund of moneys paid under protest in discharge of an income tax assessment.

*Mr. Solicitor General Beck,* with whom *Mr. Carl A. Mapes, Mr. Newton K. Fox* and *Mr. Andrew J. Aldridge* were on the brief, for the United States.

The New Jersey corporation could have distributed its large surplus in cash or in specie, either as securities or, if divisible, tangible property. In either case the distribution would have been income. However, it sold its entire plant to a new corporation. The fact that the new corporation was formed by the managing body of the old and that there was a momentary identity of stockholders can not in any way affect the question. They formed the new corporation in another State and with such franchises as that State granted corporations of this character.

Whether these franchises, as granted by Delaware, were the same or different from the franchise granted to the old company by New Jersey does not appear. Presumably, the promoters of the new company found some advantage in securing a different corporate situs.

The new corporation had a much larger authorized capital stock. The relations between the stockholders *inter sese* were likewise changed in regard to the amounts, kinds and proportions of stock authorized. Moreover, the Delaware company retained in its treasury one-half of its stock which was not issued; but, as it was authorized, its possible issue was contemplated. Therefore, potentially, the relative proportions of the common owners of this property would be very much changed, and the stockholders greatly augmented in numbers, if and when one-half of the whole capital stock of the new corporation was, as was possible, sold to the public.

The old company continued its operations as a company. Thenceforth it had the stock in question, out of which it proceeded to retire its bonded indebtedness and, so far as possible, its preferred stock, and it held the precise equivalent of its common stock in valuable interest-bearing assets, and a large surplus, which it divided among its stockholders. Nothing prevented it from taking its existing assets, purchasing a new plant, and competing with the new company. For all legal and practical purposes the two corporations were separate. The identity of management and stockholders were potentially and probably but temporary. And when we are considering whether these corporations are or are not separate entities, the possibilities or powers affect the question quite as much as the temporary realities.

The fact that the distribution of securities by the New Jersey corporation was contemporaneous with the sale of its assets is also immaterial. It is not important when these transactions took place, but what was their essen-

tial character. The controlling question is, Was this distribution by the New Jersey company of Delaware stock a distribution of surplus earnings, or was it merely a duplication of its own certificates, representing the same proportionate interest in the capital assets of the New Jersey company? It is not denied that, whatever the nature of this dividend may be, it represented a distribution of surplus profits, for the capital assets of the New Jersey company remained intact. Moreover, the Delaware stock represented corporate interests in assets, which had been severed from the New Jersey corporation by alienation. Thenceforth the New Jersey stock could not be regarded as representing proportionate interests in the plant and assets thus conveyed; and the New Jersey stockholders owned proportionate interests in securities of another corporation which were not only potentially but in fact different from those of the New Jersey corporation.

The reasoning in *New York Trust Co.* v. *Edwards,* 274 Fed. 952, seems more convincing than that of the court below, which based its conclusion largely upon the inconclusive fact that the market value of the New Jersey and Delaware stock in the stockholders' hands after the dividend was the same as the value of the New Jersey stock before the dividend. This normally happens whenever a corporation declares a dividend. It generally loses in market value by the amount of the dividend, and this is especially true where the dividend is a large or unusual one. Judge Hand bases his conclusion upon the true ground, viz, that the assets which were epresented by the Delaware stock were no longer the property of the New Jersey company.

What matters it whether the Delaware stock, which was issued against the assets purchased from the New Jersey company, was distribute as a dividend to the New Jersey stockholders, or the New Jersey stockholders first received the cash and then got the Delaware stock? In

either event, the New Jersey stockholder received cash or
its equivalent, for he could sell his Delaware stock for cash
without diminishing his proportionate interest in the
capital stock of the New Jersey corporation.

The ownership by one corporation, or by the stock-
holders of one corporation, of the stock of another, does
not destroy the distinct legal entity of the two corpora-
tions.   In cases involving taxation the courts have con-
sistently refused to disregard the principle of corporate
entity.  *Eisner* v. *Macomber*, 252 U. S. 189, 214.  *South-
ern Pacific Co.* v. *Lowe*, 247 U. S. 330; and *Gulf Oil Cor-
poration* v. *Lewellyn*, 248 U. S. 71, are clearly distinguish-
able from the instant case.   There is little similarity be-
tween the facts in those cases and the facts in the instant
case.

*Peabody* v. *Eisner*, 247 U. S. 347, is controlling.  See
*Eisner* v. *Macomber*, 252 U. S. 189, 211; *Towne* v. *Eisner*,
245 U. S. 418, 426.

The dividend in this case was not a liquidation divi-
dend.  *Lynch* v. *Turrish*, 247 U. S. 221, therefore, has no
application.  The limitations of the *Turrish Case* are
clearly brought out in *Lynch* v. *Hornby*, 247 U. S. 339.

Fluctuation in market value is not the criterion which
determines whether income has been derived from capital,
but the segregation of corporate assets, which before seg-
regation represented only an inchoate right of the stock-
holder, does determine whether income has been received.
See *Eisner* v. *Macomber, supra*, 208.   The dividend came
*ab extra* and constituted " a gain derived from capital "—
" income derived from any source whatever."

It is immaterial whether the property sold by the old
corporation to the new was acquired prior to, or after,
March 1, 1913.  *Lynch* v. *Hornby, supra*.

The argument which evidently impressed the court be-
low is the alleged hardship upon the stockholder.  But we
are dealing with a distribution of profits which were un-

precedented in size. The case in principle would not differ whether the dividend was large or small in proportion to par value. This court should be very slow in asserting a principle with respect to a dividend of unusual size, which would necessarily be applicable to a very much smaller dividend. The hardship, however, is more apparent than real.

*Mr. William A. Glasgow, Jr.,* and *Mr. Frank S. Bright,* with whom *Mr. J. P. Laffey* and *Mr. C. R. Mudge* were on the brief, for appellee.

The common stock of the Delaware company received by appellee was not " income arising or accruing to him," nor was it " gain or profit derived by him "; it was simply the evidence of his pro rata interest in the assets of the company which it was determined to retain in the business, in increasing the capital, upon a financial reorganization, and was not assessable under the Act of 1913.

It is evident that there was no purpose to distribute any part of the assets of the New Jersey company, but that the purpose was to fix and retain all of the assets, cash and good will in an operating corporation, as capital, and to prevent the distribution thereof to the stockholders, issuing to them, however, additional certificates as evidence of the same proportionate interests in exactly the same assets; and that the plan contemplated the continued operation of the business as an entirety, and under a new charter, as a going concern.

If upon a valuation of its assets the New Jersey company had determined that all of the assets were to be retained as capital, and had issued to its stockholders pro rata common stock based upon this valuation, there could be no contention that the stockholders had received income, gain or profit. This is admitted by the Government.

There is in substance no difference between an issue of common stock as evidence of pro rata interest in the

same assets and business, whether issued by the old company or by the new. It is only a question of form. Before the transaction the stockholder's interest was represented by one certificate,—afterwards by three; and his proportionate interest was the same in the undivided assets, as found by the court below. *Gibbons* v. *Mahon,* 136 U. S. 549, 558, 559; *Eisner* v. *Macomber,* 252 U. S. 189, 207, 210, 213.

On September 30, 1915, a stockholder of the old company having one share held a certificate which he could sell in the open market for $795. This value did not accrue in the preceding calendar year, but was the accumulated value based upon the company's assets. By the reorganization of the old company and the transfer of its assets to the new, the same stockholder held, on October 1, 1915, three shares of stock represented by two certificates based upon exactly the same assets, undistributed, upon which his one share in the old company was based. There had been no segregation of profits; there was no certificate representing a personal gain to appellee, since the certificates new and old are alike in what they represent—a capital interest in the entire concerns of the corporation. The three shares were worth exactly what his one share in the old company was worth on September 30th, and appellee had no profit by the transaction, there had been no gain derived from capital, no gain had accrued to him, and under no proper construction of the facts can it be held that he derived income from this readjustment of the financial business of the company.

The capital and profits of the old company were so far absorbed in the business which was transferred to the new company as an entirety and as a going concern, that the effect thereof was to render it impracticable to separate them for withdrawal and distribution. This transaction added nothing to the interests of the shareholders, and

the only change was in the evidence which represents the interests of the shareholders in exactly the same assets and business.

The old company had at one time a large amount in Anglo-French bonds, which were afterward paid out to the stockholders by a dividend in kind, and upon which income tax was duly paid. If these were among the assets transferred to the new company, the position of the Government in this case would be that appellee must pay a tax on the common stock of the new company received by him at its market value, which market value was partly based upon the bonds; and that thereafter, when the bonds were segregated from the assets of the business and distributed to the stockholders, again the appellee must pay a tax upon the market value of these bonds. The effect would be to first tax the stockholders upon the assets represented by the stock certificates of the new company as a whole, and then to tax them upon these assets when distributed. This could not have been intended by the Income Tax Act.

As an illustration: An investor bought on September 25, 1915, one share in the New Jersey company for $795, its then alleged market value. This stockholder's income from other sources was such that if the present law had then been in effect he would have been required to pay 50 per cent. of the income received as a tax. On October 1, 1915, there were issued to him two shares of the Delaware company worth at the time $347.50 per share, and he still held his one share in the New Jersey company of the par and market value of $100; the result of which was that he had three certificates representing his investment worth exactly the same amount as he had paid for the one certificate in the New Jersey company. The Government's contention now is that both shares of the Delaware company are income, and that one share must be sold and the $347.50 realized thereon must be paid to the

Government as income tax, and then the stockholder would have left one share of the New Jersey company worth $100 and one of the Delaware company worth $347.50, a total of $447.50, in place of the $795 which he had paid for the share of the New Jersey company. Yet the Government urges that this stockholder has received in the calendar year by this transaction a gain or profit on his investment.

Another illustration: The estate of A, deceased, was in the hands of trustees, to pay the income to a life tenant and at his death to divide the capital among remaindermen. On October 1st the trustees received two shares of the Delaware stock for each share held by them of the common stock of the New Jersey company.

If the Government's contention be correct, the corpus of the estate (shares of the New Jersey common stock,) was worth on September 30th, $795 for each share. On October 1st, the entire corpus was the New Jersey stock, worth $100 per share, and the life tenant was entitled to all of the shares issued to the trustees by the Delaware company, worth $347.50 per share. In other words, by the reorganization, the corpus of the estate lost over night six-sevenths of its value.

Can there be any doubt that the Delaware stock was capital as well for purposes of the income tax law as for distribution between life tenant and remainderman? *Towne* v. *Eisner,* 245 U. S. 418, 426.

The fact that the value of the shares held by appellee was exactly the same after October 1st as the shares held by him prior to that date in the New Jersey company, was merely one of the facts relied upon by the court below in concluding that appellee had received no taxable income, gain or profit. The court was fully justified in taking this into consideration, in view of the decision in the *Towne Case, supra.*

The effect of this transaction, so far as the stockholder and the business were concerned, is the same as if a stock

dividend had been made by the New Jersey company. *Eisner* v. *Macomber,* 252 U. S. 189, 213.

The fact that the two companies were distinct legal entities is not controlling. It is evident that the entire business of the company was to be carried on as one enterprise, just as it had been before, with the intervention of a technical legal entity incorporated under the laws of Delaware. Exactly the same situation existed in *Southern Pacific Co.* v. *Lowe,* 247 U. S. 330, 337. The new company was simply an agency created by the old to carry on the business theretofore carried on by the latter. In mere form only this transaction bore the appearance of income to appellee, while in truth and in substance appellee had no greater interest than he had before the reorganization. See *Gulf Oil Corporation* v. *Lewellyn,* 248 U. S. 71, 72.

The facts in the *Peabody Case, supra,* were so different that the reasoning there does not control.

The whole reasoning of the court in *Towne* v. *Eisner,* 245 U. S. 418, (which was affirmed in *Eisner* v. *Macomber, supra,*) is applicable to the facts of this case.

MR. JUSTICE PITNEY delivered the opinion of the court.

The court below sustained the claim of C. W. Phellis for a refund of certain moneys paid by him under protest in discharge of an additional tax assessed against him for the year 1915, based upon alleged income equivalent to the market value of 500 shares of stock of a Delaware corporation called the E. I. du Pont de Nemours & Company, received by him as a dividend upon his 250 shares of stock of the E. I. du Pont de Nemours Powder Company, a New Jersey corporation. The United States appeals.

From the findings of the Court of Claims, read in connection with claimant's petition, the following essential facts appear. In and prior to September, 1915, the New Jersey company had been engaged for many years in the business of manufacturing and selling explosives. Its

funded debt and its capital stock at par values were as
follows:

| | |
|---|---:|
| 5% mortgage bonds | $1, 230, 000 |
| 4½% 30-year bonds | 14, 166, 000 |
| Preferred stock ($100 shares) | 16, 068, 600 |
| Common stock ($100 shares) | 29, 427, 100 |
| Total | $60, 891, 700 |

It had an excess of assets over liabilities showing a
large surplus of accumulated profits; the precise amount
is not important, except that it should be stated that it
was sufficient to cover the dividend distribution presently
to ·be mentioned. In that month a reorganization and
financial adjustment of the business was resolved upon
and carried into effect with the assent of a sufficient pro-
portion of the stockholders, in which a new corporation·
was formed under the laws of Delaware with an author-
ized capital stock of $240,000,000 to consist in part of
debenture stock bearing 6 per cent. cumulative dividends,
in part of common stock; and to this new corporation all
the assets and good-will of the New Jersey company were
transferred as an entirety and as a going concern, as of
October 1, 1915, at a valuation of $120,000,000, the new
company assuming all the obligations of the old except
its capital stock and funded debt. In payment of the
consideration, the old company retained $1,484,100 in
cash to be used in redemption of its outstanding 5% .
mortgage bonds, and received $59,661,700 par value in
debenture stock of the new company (of which $30,234,-
600 was to be used in taking up, share for share and dollar
for dollar, the preferred stock of .the old company and
redeeming its 30-year bonds), and $58,854,200 par value
of the common stock of the new company which was to be
and was immediately distributed among the common
stockholders of the old company as a dividend, paying·
them two shares of the new stock for each share they held

in the old company. This plan was carried out by appropriate corporate action; the new company took over all the assets of the old company, and that company besides paying off its 5% bonds acquired debenture stock of the new company sufficient to liquidate its 4½% 30-year bonds and retire its preferred stock, additional debenture stock equal in amount at par to its own outstanding common stock, and also two shares of common stock of the Delaware corporation for each share of the outstanding common stock of the New Jersey corporation. Each holder of the New Jersey company's common stock (including claimant), retained his old stock and besides received a dividend of two shares for one in common stock of the Delaware company, and the New Jersey corporation retained in its treasury 6 per cent. debenture stock of the Delaware corporation equivalent to the par value of its own outstanding common stock. The personnel of the stockholders and officers of the two corporations was on October 1, 1915, identical, the new company having elected the same officers as the old; and the holders of common stock in both corporations had the same proportionate stockholding in each. After the reorganization and the distribution of the stock of the Delaware corporation, the New Jersey corporation continued as a going concern, and still exists but, except for the redemption of its outstanding bonds, the exchange of debenture stock for its preferred stock, and the holding of debenture stock to an amount equivalent to its own outstanding common and the collection and disposition of dividends thereon, it has done no business. It is not, however, in process of liquidation. It has received as income upon the Delaware company's debenture stock held by it, dividends to the amount of 6% per annum, which it has paid out to its own stockholders including the claimant. The fair market value of the stock of the New Jersey corporation on September 30, 1915, prior to the reorganization, was $795

per share, and its fair market value, after the execution of the contracts between the two corporations, was on October 1, 1915, $100 per share. The fair market value of the stock of the Delaware corporation distributed as aforesaid was on October 1, 1915, $347.50 per share. The Commissioner of Internal Revenue held that the 500 shares of Delaware company stock acquired by claimant in the distribution was income of the value of $347.50 per share and assessed the additional tax accordingly.

The Court of Claims, observing that from the facts as found claimant's 250 shares of stock in the New Jersey corporation were worth on the market, prior to the transfer and dividend, precisely the same that the same shares plus the Delaware company's shares received by him were worth thereafter, and that he did not gain any increase in the value of his aggregate holdings by the operation, held that the whole transaction was to be regarded as merely a financial reorganization of the business of the company, producing to him no profit and hence no income, and that the distribution was in effect a stock dividend nontaxable as income under the authority of *Eisner* v. *Macomber,* 252 U. S. 189, and not within the rule of *Peabody* v. *Eisner,* 247 U. S. 347.

We recognize the importance of regarding matters of substance and disregarding forms in applying the provisions of the Sixteenth Amendment and income tax laws enacted thereunder. In a number of cases besides those just cited we have under varying conditions followed the rule. *Lynch* v. *Turrish,* 247 U. S. 221; *Southern Pacific Co.* v. *Lowe,* 247 U. S. 330; *Gulf Oil Corporation* v. *Lewellyn,* 248 U. S. 71.

The act under which the tax now in question was imposed, (Act of October 3, 1913, c. 16, 38 Stat. 114, 166–167), declares that income shall include, among other things, gains derived "from interest, rent, dividends, securities, or the transaction of any lawful business carried

on for gain or profit, or gains or profits and income derived from any source whatever." Disregarding the slight looseness of construction, we interpret "gains, profits, and income derived *from* . . . dividends," etc., as meaning not that everything in the form of a dividend must be treated as income, but that income derived *in the way of* dividends shall be taxed. Hence the inquiry must be whether the shares of stock in the new company received by claimant as a dividend by reason of his ownership of stock in the old company constituted (to apply the tests laid down in *Eisner* v. *Macomber,* 252 U. S. 189, 207), a gain derived from capital, not a gain accruing to capital, nor a growth or increment of value in the investment, but a gain, a profit, something of exchangeable value proceeding from the property, severed from the capital however invested, and coming in, that is, received or drawn by the claimant for his separate use, benefit and disposal.

Claimant's capital investment was represented by his New Jersey shares. Whatever increment of value had accrued to them prior to September 30, 1915, by reason of the surplus profits that theretofore had been accumulated by the company, was still a part of claimant's capital, from which as yet he had derived no actual and therefore no taxable income so far as the surplus remained undistributed. As yet he had no right to withdraw it or any part of it, could not have such right until action by the company or its proper representatives, and his interest still was but the general property interest of a stockholder in the entire assets, business and affairs of the company— a capital interest; as we declared in *Eisner* v. *Macomber, supra* (p. 208).

Upon the face of things, however, the transfer of the old company's assets to the new company in exchange for the securities issued by the latter, and the distribution of those securities by the old company among its stock-

holders, changed the former situation materially. The common stock of the new company, after its transfer to the old company and prior to its distribution, constituted assets of the old company which it now held to represent its surplus of accumulated profits—still however a common fund in which the individual stockholders of the old company had no separate interest. But when this common stock was distributed among the common stockholders of the old company as a dividend, then at once— unless the two companies must be regarded as substantially identical—the individual stockholders of the old company, including claimant, received assets of exchangeable and actual value severed from their capital interest in the old company, proceeding from it as the result of a division of former corporate profits, and drawn by them severally for their individual and separate use and benefit. Such a gain resulting from their ownership of stock in the old company and proceeding from it constituted individual income in the proper sense.

That a comparison of the market value of claimant's shares in the New Jersey corporation immediately before, with the aggregate market value of those shares plus the dividend shares immediately after the dividend showed no change in the aggregate—a fact relied upon by the Court of Claims as demonstrating that claimant neither gained nor lost pecuniarily in the transaction—seems to us a circumstance of no particular importance in the present inquiry. Assuming the market values were a precise reflex of intrinsic values, they would show merely that claimant acquired no increase in aggregate wealth through the mere effect of the reorganization and consequent dividend, not that the dividend did not constitute income. There would remain the presumption that the value of the New Jersey shares immediately prior to the transaction reflected the original capital investment plus the accretions which had resulted through the company's

business activities and constituted its surplus; a surplus in which, until dividend made, the individual stockholder had no property interest except as it increased the valuation of his capital. It is the appropriate function of a dividend to convert a part of a surplus thus accumulated from property of the company into property of the individual stockholders; the stockholder's share being thereby released to and drawn by him as profits or income derived from the company. That the distribution reduces the intrinsic capital value of the shares by an equal amount is a normal and necessary effect of all dividend distributions—whether large or small and whether paid in money or in other divisible assets—but such reduction constitutes the dividend none the less income derived by the stockholder if it represents gains previously acquired by the corporation. Hence, a comparison of aggregate values immediately before with those immediately after the dividend is not a proper test for determining whether individual income, taxable against the stockholder, has been received by means of the dividend.

The possibility of occasional instances of apparent hardship in the incidence of the tax may be conceded. Where, as in this case, the dividend constitutes a distribution of profits accumulated during an extended period and bears a large proportion to the par value of the stock, if an investor happened to buy stock shortly before the dividend, paying a price enhanced by an estimate of the capital plus the surplus of the company, and after distribution of the surplus, with corresponding reduction in the intrinsic and market value of the shares, he were called upon to pay a tax upon the dividend received, it might look in his case like a tax upon his capital. But it is only apparently so. In buying at a price that reflected the accumulated profits, he of course acquired as a part of the valuable rights purchased the prospect of a dividend from the accumulations—bought " dividend on," as the phrase

goes—and necessarily took subject to the burden of the
income tax proper to be assessed against him by reason
of the dividend if and when made. He simply stepped
into the shoes, in this as in other respects, of the stock-
holder whose shares he acquired, and presumably the
prospect of a dividend influenced the price paid, and was
discounted by the prospect of an income tax to be paid
thereon. In short, the question whether a dividend made
out of company profits constitutes income of the stock-
holder is not affected by antecedent transfers of the stock
from hand to hand.

There is more force in the suggestion that, looking
through and through the entire transaction out of which
the distribution came, it was but a financial reorganiza-
tion of the business as it stood before, without diminution
of the aggregate assets or change in the general corporate
objects and purposes, without change of personnel either
in officers or stockholders, or change in the proportionate
interest of any individual stockholder. The argument, in
effect, is that there was no loss of essential identity on the
part of the company, only a change of the legal habili-
ments in which the aggregate corporate interests were
clothed, no substantial realization by individual stock-
holders out of the previous accumulation of corporate
profits, merely a distribution of additional certificates in-
dicating an increase in the value of their capital holdings.
This brings into view the general effect of the combined
action of the entire body of stockholders as a mass.

In such matters, what was done, rather than the design
and purpose of the participants, should be the test. How-
ever, in this case there is no difference. The proposed plan
was set out in a written communication from the presi-
dent of the New Jersey corporation to the stockholders, a
written assent signed by about 90 per cent. of the stock-
holders, a written agreement made between the old com-
pany and the new, and a bill of sale made by the former

to the latter, all of which are in the findings. The plan as thus proposed and adopted, and as carried out, involved the formation of a *new corporation* to take over the business and the business assets of the old; it was to be and was formed under the laws of a *different State,* which necessarily imports a different measure of responsibility to the public, and presumably different rights between stockholders and company and between stockholders *inter sese,* than before. The articles of association of neither company are made to appear, but in favor of the asserted identity between the companies we will assume (contrary to the probabilities) that there was no significant difference here. But the new company was to have authorized capital stock aggregating $240,000,000—nearly four times the aggregate stock issues and funded debt of the old company—of which less than one-half ($118,515,900) was to be issued presently to the old company or its stockholders, leaving the future disposition of a majority of the authorized new issues still to be determined. There was no present change of officers or stockholders, but manifestly a continuation of identity in this respect depended upon continued unanimous consent or concurrent action of a multitude of individual stockholders actuated by motives and influences necessarily to some extent divergent. In the light of all this we cannot regard the new company as virtually identical with the old, but must treat it as a substantial corporate body with its own separate identity, and its stockholders as having property rights and interests materially different from those incident to ownership of stock in the old company.

The findings show that it was intended to be established as such, and that it was so created in fact and in law. There is nothing to warrant us in treating this separateness as imaginary, unless the identity of the body of stockholders and the transfer *in solido* of the manufacturing business and assets from the old company to the

new necessarily have that effect. But the identity of stockholders was but a temporary condition, subject to change at any moment at the option of any individual. As to the assets, the very fact of their transfer from one company to the other evidenced the actual separateness of the two companies.

But further, it would be erroneous, we think, to test the question whether an individual stockholder derived income in the true and substantial sense through receiving a part in the distribution of the new shares, by regarding alone the general effect of the reorganization upon the aggregate body of stockholders. The liability of a stockholder to pay an individual income tax must be tested by the effect of the transaction upon the individual. It was a part of the purpose and a necessary result of the plan of reorganization, as carried out, that common stock of the new company to the extent of $58,854,200 should be turned over to the old company, treated by it as assets to be distributed as against its liability to stockholders for accrued surplus, and thereupon distributed to them " as a dividend." The assent of the stockholders was based upon this as a part of the plan.

In thus creating the common stock of the new company and transferring it to the old company for distribution *pro rata* among its stockholders, the parties were acting in the exercise of their rights for the very purpose of placing the common stockholders individually in possession of new and substantial property rights *in esse,* in realization of their former contingent right to participate eventually in the accumulated surplus. No question is made but that the proceedings taken were legally adequate to accomplish the purpose. The new common stock became treasury assets of the old company, and was capable of distribution as the manufacturing assets whose place it took were not. Its distribution transferred to the several stockholders new individual property rights which they

.severally were entitled to retain and enjoy, or to sell and transfer, with precisely the same substantial benefit to each as if the old company had acquired the stock by purchase from strangers. According to the findings the stock thus distributed was marketable. There was neither express nor implied condition, arising out of the plan of reorganization or otherwise, to prevent any stockholder from selling it; and he could sell his entire portion or any of it without parting with his capital interest in the parent company, or affecting his proportionate relation to the interests of other stockholders. Whether he sold the new stock for money or retained it in preference, in either case when he received it he received as his separate property a part of the accumulated profits of the old company in which previously he had only a potential and contingent interest.

It thus appears that in substance and fact, as well as in appearance, the dividend received by claimant was a gain, a profit, derived from his capital interest in the old company, not in liquidation of the capital but in distribution of accumulated profits of the company; something of exchangeable value produced by and proceeding from his investment therein, severed from it and drawn by him for his separate use. Hence it constituted individual income within the meaning of the income tax law, as clearly as was the case in *Peabody* v. *Eisner,* 247 U. S. 347.

> *Judgment of the Court of Claims reversed, and the cause remanded with directions to dismiss the suit.*

Mr. Justice McReynolds, dissenting.

In the course of its opinion, citing *Eisner* v. *Macomber,* 252 U. S. 189, 213, the Court of Claims declared:

" We think the whole transaction is to be regarded as merely a financial reorganization of the business of the company and that this view is justified by the power and duty of the court to look through the form of the trans-

action to its substance." And further, "It seems incredible that Congress intended to tax as income a business transaction which admittedly produced no gain, no profit, and hence no income. If any income had accrued to the plaintiff by reason of the sale and exchange made it would doubtless be taxable."

There were perfectly good reasons for the reorganization and the good faith of the parties is not questioned. I assume that the statute was not intended to put an embargo upon legitimate reorganizations when deemed essential for carrying on important enterprises. *Eisner* v. *Macomber* was rightly decided and the principle which I think it announced seems in conflict with the decision just announced.

MR. JUSTICE VAN DEVANTER concurs in this dissent.