**BURNET, Com'r of Internal Revenue, v. KOUNTZE.**

**No. 9664.**

Circuit Court of Appeals, Eighth Circuit.

June 24, 1933.

John MacC. Hudson, Sp. Asst. to Atty. Gen. (Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and Byron M. Coon, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for petitioner.

Kenneth S. Finlayson, of Omaha, Neb. (Edward R. Burke, of Omaha, Neb., on the brief), for respondent.

Before GARDNER, SANBORN, and BOOTH, Circuit Judges.

BOOTH, Circuit Judge.

This is a petition for review of an order of the Board of Tax Appeals which redetermined the alleged deficiency, as found by the Commissioner of Internal Revenue, in the income taxes of respondent Kountze for the year 1923 and granted to him a recovery for overpayment.

The Board of Tax Appeals had before it six cases involving the same question and differing only in the amounts involved. By stipulation it was agreed that the cases should be consolidated for hearing, and that the decision of this court in one of the cases should be accepted as the decision in all. A transcript of record in one case only presents to this court the questions involved.

The broad inquiry is as to the amount of gain derived by Kountze from a sale in 1923 of certain shares of corporate stock owned by him.

The relevant statutory provisions are contained in the Revenue Act of 1921.[1]

It is plain in the case at bar that the statute involves a sum in subtraction, the minuend being the amount realized from the sale of the stock in 1923; and the subtrahend being the cost of the stock if acquired after February 28, 1913; or the cost of the stock if acquired before March 1, 1913, unless the fair market price or value on March 1, 1913, exceeded the actual cost, in which case such fair market price or value should be used.

---

[1] Revenue Act of 1921, 42 Stat. 227, 229:

"Sec. 202. (a) That the basis for ascertaining the gain derived or loss sustained from a sale or other disposition of property, real, personal, or mixed, acquired after February 28, 1913, shall be the cost of such property; except that— * * *

"(b) The basis for ascertaining the gain derived or loss sustained from the sale or other disposition of property, real, personal, or mixed, acquired before March 1, 1913, shall be the same as that provided by subdivision (a); but—

"(1) If its fair market price or value as of March 1, 1913, is in excess of such basis, the gain to be included in the gross income shall be the excess of the amount realized therefor over such fair market price or value."

The fixing of the amount of the subtrahend is the subject of controversy in the present suit.

The findings of fact of the Board of Tax Appeals are set out in the margin.[2] They are not attacked. The ones more directly here involved are as follows:

"The Union Company of Omaha, hereinafter known as The Union Company, was incorporated in 1908 under the laws of Nebraska for the purpose of owning and holding the stock of, and managing and operating, subsidiary companies engaged in the manufacture and sale of gas and of electric light and power and in the sale of electric appliances.

*   *   *

"In September, 1917, Frederick H. Davis, Charles T. Kountze, Luther L. Kountze, Willis Todd, Thomas L. Davis and Walter B. Roberts [sole stockholders of the Union Company] organized and incorporated the Union Power and Light Company under the laws of Nebraska, with an authorized capital stock of $1,000,000 in common and $1,000,000 in preferred stock, each having the par value of $100 per share. On September 12, 1917, The Union Company sold all of its assets, being the capital stock of its several subsidiary companies, to the Union Power and Light Com-

[2] "Findings of Fact.

"The Union Company of Omaha, hereinafter known as The Union Company, was incorporated in 1908 under the laws of Nebraska for the purpose of owning and holding the stock of, and managing and operating, subsidiary companies engaged in the manufacture and sale of gas and of electric light and power and in the sale of electric appliances. The original capital stock was 200 shares, all common, of the par value of $100 per share. In August, 1911, the issue was increased to $500,000 and on May 21, 1917, to $1,000,000. Additional stock certificates were not issued but in May, 1917, the company increased its capital stock account on its books to $903,000. On March 1, 1913, The Union Company had outstanding 4,046 shares of common stock of the par value of $100 per share. The stock was owned by Frederick H. Davis, its principal stockholder and owner of 1,288 shares; his son, Thomas L. Davis, holding 429 shares; Charles T. Kountze and Luther L. Kountze, each owning 858 shares; and Willis Todd and Walter B. Roberts, possessing 300 and 313 shares, respectively. Todd acquired his stock on December 12, 1912, at $40 per share. The purchase was made on the basis of par, the difference between $100 and $40 per share representing a salary compensation which The Union Company felt unable to pay at that time. Roberts was the son-in-law of Frederick H. Davis and was related to Charles Kountze and Luther L. Kountze by marriage. In January, 1916, he abandoned his own business and became the secretary and treasurer of The Union Company. In May of that year he acquired 313 shares of capital stock of that corporation at $40 per share because of his close family relationship to the other stockholders.

"Prior to 1911 The Union Company had acquired practically all of the capital stock of the Columbus Light, Heat and Power Company of Aberdeen, South Dakota, and on March 1, 1913, owned approximately 91 per cent of such stock. The individual stockholders of The Union Company acquired the capital stock of the several subsidiaries and exchanged it for stock of The Union Company in the ratio of two shares of the subsidiary corporation for one of The Union Company.

"In 1913 The Union Company acquired the capital stock of the North Platte Light and Power Company of North Platte, Nebraska, and in 1914 it purchased the electric plant of the town of Chariton, Iowa, and the stock of the Osceola Light and Power Company of Osceola, Iowa. These latter companies were merged into the Southern Iowa Gas and Electric Company, whose capital stock The Union Company owned. In May, 1917, The Union Company acquired the plants of Watertown and Yankton, South Dakota, and combined them into a corporation called Eastern Dakota Electric Light and Power Company, all of whose capital stock The Union Company held.

"In September, 1917, Frederick H. Davis, Charles T. Kountze, Luther L. Kountze, Willis Todd, Thomas L. Davis and Walter B. Roberts organized and incorporated the Union Power and Light Company under the laws of Nebraska, with an authorized cap-

ital stock of $1,000,000 in common and $1,000,000 in preferred stock, each having the par value of $100 per share. On September 12, 1917, The Union Company sold all of its assets, being the capital stock of its several subsidiary companies, to the Union Power and Light Company, for the entire issue of $1,000,000 of common stock and $250,000 of preferred stock and thereupon distributed the 10,000 shares of common and 2,500 shares of preferred stock to its stockholders in the same proportion as they had owned the common stock of The Union Company. The Union Company thereupon was dissolved. The Union Power and Light Company sold an additional 2,500 shares of preferred at par ($100) to the public at large and such shares were held by residents of Nebraska, Iowa and other adjoining States.

"On September 12, 1917, the common stock of the Union Power and Light Company was held as follows:

| | |
|---|---:|
| Frederick H. Davis | 3,184 |
| Charles T. Kountze | 2,120 |
| Luther L. Kountze | 2,120 |
| Thomas L. Davis | 1,060 |
| Walter B. Roberts | 774 |
| Willis Todd | 742 |
| | 10,000 |

"The preferred stock of the Union Light and Power Company paid a cumulative dividend of 7 per cent and was preferred as to participation in the assets of the corporation upon dissolution or sale.

"On October 10, 1923, all of the stockholders of the Union Power and Light Company entered into an agreement to sell to Albert Emanuel Company, Inc., of New York all of its common stock, or 10,000 shares, for $1,450,000 and also to sell all preferred stock owned by such stockholders at par plus accrued dividends, under certain conditions therein set forth. In November or December, 1923, the several stockholders of the Union Power and Light Company completed the sales of such stock, receiving therefor in the aggregate $975,000 in cash, less $70,326.24 reserved for incidental expenses, and $250,000 in bonds and $225,000 in the preferred stock of the Northwestern Public Service Corporation, which had been organized to take over the properties so sold. The said stockholders also sold to the Emanuel Company 575 shares of the preferred stock of the Union Power and Light Company according to the terms of their contract. The petitioners reported in their income-tax returns for 1923 a profit based on the difference between the March 1, 1913, value of The Union Company stock, fixed by them at $100 per share, and the sale price received in December, 1923. The respondent based his deficiency notices on a March 1, 1913, value of $40 per share for such stock. Neither in the returns nor in the notices of deficiencies was the date of reorganization used as a basis.

"The fair market value of the common stock of the Union Power and Light Company on September 12, 1917, was $125 per share."

pany, for the entire issue of $1,000,000 of common stock and $250,000 of preferred stock and thereupon distributed the 10,000 shares of common and 2,500 shares of preferred stock to its stockholders in the same proportion as they had owned the common stock of The Union Company. The Union Company thereupon was dissolved. The Union Power and Light Company sold an additional 2,500 shares of preferred at par ($100) to the public at large and such shares were held by residents of Nebraska, Iowa and other adjoining States. * * *

"The preferred stock of the Union Light and Power Company paid a cumulative dividend of 7 per cent and was preferred as to participation in the assets of the corporation upon dissolution or sale."

It is apparent from these findings that the real point in dispute is whether the value of the Union Company stock in 1913, then owned by Kountze, or the value of the stock of the Union Power & Light Company in 1917, then owned by Kountze and for which his stock in the Union Company had been exchanged, should be used as the subtrahend above mentioned.

The Commissioner of Internal Revenue used the value of the Union Company stock in 1913; the Board of Tax Appeals used the value of the Union Power & Light Company stock in 1917.

In order to decide which value was the correct one to be used, we must examine the character and result of the transaction of 1917 involving the exchange of stock, which is set out in the findings of the Board of Tax Appeals.

The Commissioner of Internal Revenue contends that the exchange of stock was made as part of the financial reorganization of one business enterprise, and that Kountze had the same proportionate interest in the same business and assets after the transaction as he had before; that, therefore, the value of the Union Company stock in 1913, then owned by Kountze, should be used.

The contention of Kountze, which was adopted by the Board of Tax Appeals, is that by the transaction in 1917 involving the exchange of stock, he acquired an essentially different interest from the one which he formerly owned in the business and assets.

■ These contentions are, of course, to be considered in the light of the relevant provisions of the statute in force in 1917, and not in the light of the provisions of the later Revenue Acts from 1918 on.

The Revenue Act of 1916, as amended by the act of 1917, was in force at the time of the transaction of 1917. The relevant provisions are given in the margin.[3]

This Revenue Act of 1916 did not expressly cover the matter of recognizing gain or loss in transactions involving corporate reorganization and exchanges of stock, as did the later Revenue Acts, but left the question whether gain or loss resulted to be decided by the general principles of law.

In determining the character and result of the transaction of 1917 here involved, we are aided and controlled by the pronouncements of the Supreme Court and of this court as to similar transactions, though connected with different situations. Among the cases to be noted are the following:

Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, clearly defined "income" and held that a stock dividend evincing merely a transfer of an accumulated surplus to the capital account of the corporation could not be taxed as income. The court in its opinion said (page 208 of 252 U. S., 40 S. Ct. 189, 193): "Certainly the interest of the stockholder is a capital interest, and his certificates of stock are but the evidence of it. They state the number of shares to which he is entitled and indicate their par value and how the stock may be transferred. They show that he or his assignors, immediate or remote, have contributed capital to the enterprise, that he is entitled to a corresponding interest proportionate to the whole, entitled to have the property and business of the company devoted during the corporate existence to attainment of the common objects, entitled to vote at stockholders' meetings, to receive dividends out of the corporation's profits if and when declared, and, in the event of liquidation, to receive a proportionate share of the net assets, if any, remaining after paying creditors."

The transaction involved in that case did not change the corporate identity. The same interest in the same corporation was represented after the distribution by more shares. There was an exchange of certificates but not of interests.

---

[3] Revenue Act of 1916, § 2(a), 39 Stat. 757, 758, amended Oct. 3, 1917, 40 Stat. 329, § 1200: "(a) That, subject only to such exemptions and deductions as are hereinafter allowed, the net income of a taxable person shall include gains, profits, and income, derived from * * * sales, or dealings in property, whether real or personal, growing out of the ownership or use of or interest in real or personal property, also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever."

In United States v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180, there was not a preservation of corporate identity, but the stockholders of the old corporation, by a distribution transaction, became stockholders in a new corporation, and as such had property rights and interests materially different from those incidental to ownership of stock in the old company. The new stock so distributed was held to be income and taxable as such.

The case of Rockefeller v. United States, 257 U. S. 176, 42 S. Ct. 68, 66 L. Ed. 186, was similar in its facts to the Phellis Case. The court in its opinion said (page 183 of 257 U. S., 42 S. Ct. 68, 70): "The facts are in all essentials indistinguishable from those presented in United States v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180, decided this day. In these cases, as in that, regarding the general effect of the entire transactions resulting from the combined action of the mass of stockholders, there was apparently little but a reorganization and financial readjustment of the affairs of the companies concerned, here a subdivision of companies, without immediate effect upon the personnel of the stockholders, or much difference in the aggregate corporate activities or properties. As in the Phellis Case, the adoption of the new arrangement did not of itself produce any increase of wealth to the stockholders, since whatever was gained by each in the value of his new pipe line stock was at the same moment withdrawn through a corresponding diminution of the value of his oil stock. Nevertheless the new stock represented assets of the oil companies standing in the place of the pipe line properties that before had constituted portions of their surplus assets, and it was capable of division among stockholders as the pipe line properties were not. The distribution, whatever its effect upon the aggregate interests of the mass of stockholders, constituted in the case of each individual a gain in the form of actual exchangeable assets transferred to him from the oil company for his separate use in partial realization of his former indivisible and contingent interest in the corporate surplus. It was in substance and effect, not merely in form, a dividend of profits by the corporation, and individual income to the stockholder."

The case of Cullinan v. Walker, 262 U. S. 134, 43 S. Ct. 495, 67 L. Ed. 904, was similar in character to the Phellis and Rockefeller Cases, except that the distribution was of a dividend made on liquidation instead of an ordinary dividend.

In Weiss v. Stearn, 265 U. S. 242, 44 S. Ct. 490, 68 L. Ed. 1001, 33 A. L. R. 520, also, the transaction involved the formation of a new corporation; but as it was organized under the laws of the same state as the old corporation and with similar powers, the corporate identity was deemed to have been maintained. The stockholders of the old corporation received cash for one-half of their shares and new stock for the other half. The latter half of the stock went to the party furnishing the cash. The new stock was issued in certificates of less par value, but in greater number. However, the proportionate interest of each old stockholder remained the same. There was no change in the character of the securities issued.

It was held that the transaction amounted merely to a financial reorganization under which each stockholder retained one-half his interest and disposed of the remainder; that each stockholder was liable for a tax upon any profits which he realized by receiving the cash payment; but that there was no taxable gain in the exchange of stock.

In the case of Marr v. United States, 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079, Marr and his wife owned 339 shares of preferred stock and 425 shares of common stock in a corporation having $15,000,000 common and $15,000,000 of 7 per cent. preferred stock. A new Delaware corporation was formed having $82,600,000 common and $20,000,000 6 per cent. preferred stock. An exchange of stock was had on the basis of one share of old common for 5 shares of new common stock; and one share of old preferred for 1⅓ share of new preferred stock. $75,000,000 of the new common was thus needed. The remaining $7,600,000 of new common stock was sold. The question was whether Marr received income by the exchange of stock. The court in its opinion said (page 539 of 268 U. S., 45 S. Ct. 575, 576):

"Marr contends that, since the new corporation was organized to take over the assets and continue the business of the old, and his capital remained invested in the same business enterprise, the additional securities distributed were in legal effect a stock dividend; and that under the rule of Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, applied in Weiss v. Stearn, 265 U. S. 242, 44 S. Ct. 490, 68 L. Ed. 1001, 33 A. L. R. 520, he was not taxable thereon as income, because he still held the whole investment. The government insists that identity of the business enterprise is not conclusive; that gain in value resulting from profits is taxable as income, not only when it is represented by an interest in a different business enterprise or property, but also when it

is represented by an essentially different interest in the same business enterprise or property; that, in the case at bar, the gain actually made is represented by securities with essentially different characteristics in an essentially different corporation; and that, consequently, the additional value of the new securities, although they are still held by the Marrs, is income under the rule applied in United States v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180; Rockefeller v. United States, 257 U. S. 176, 42 S. Ct. 68, 66 L. Ed. 186; and Cullinan v. Walker, 262 U. S. 134, 43 S. Ct. 495, 67 L. Ed. 906. In our opinion the government is right. * * *

"In the case at bar, the new corporation is essentially different from the old. A corporation organized under the laws of Delaware does not have the same rights and powers as one organized under the laws of New Jersey. Because of these inherent differences in rights and powers, both the preferred and the common stock of the old corporation is an essentially different thing from stock of the same general kind in the new. But there are also adventitious differences, substantial in character. A 6 per cent. nonvoting preferred stock is an essentially different thing from a 7 per cent. voting preferred stock. A common stock subject to the priority of $20,000,000 preferred and a $1,200,000 annual dividend charge is an essentially different thing from a common stock subject only to $15,000,000 preferred and a $1,050,000 annual dividend charge. The case at bar is not one in which after the distribution the stockholders have the same proportional interest of the same kind in essentially the same corporation."

In United States v. Siegel, 52 F.(2d) 63 (C. C. A. 8), Siegel owned 255 shares in the Third National Bank of St. Louis, Mo. The capital of the bank was $2,000,000. Its surplus was $2,000,000, and its undivided profits $350,000, making a total of $4,350,000. A merger of that bank and two other banks was had under the charter of the Third National Bank. Preliminary to the merger, an increase of stock of the Third National Bank was had, making it $3,000,000. $500,000 of this stock was sold to the stockholders at $200 per share. An increase of stock in one of the other banks was also made. A new bank was formed known as the First National Bank in St. Louis, and the business was conducted under the charter of the Third National Bank. The stock of the new bank was $15,500,000 and a special trust fund of $250,000 was set aside for the stockholders of the Third National Bank, representing an agreed excess value of the business of that bank; 33,333⅓ shares of the stock of the new bank were allotted to the stockholders of each of the consolidating banks. Each stockholder received 1⅓ shares of the new stock for one share of his old stock. Siegel accordingly received 340 shares of the new stock for his 255 shares of old stock. In reference to this transaction, this court said, speaking by Judge Gardner (page 65):

"If the interest of the taxpayer after the merger or consolidation was fundamentally and materially different from his interest prior thereto, then a taxable income resulted from the transaction. While the First National Bank in St. Louis continued under the charter issued to the Third National Bank, it was, in our opinion, a substantially and fundamentally different institution after the merger of these banks than it had theretofore been. The consolidating banks, other than the Third National Bank, were left without property and without liabilities, both the property and the liabilities of these institutions having passed to the consolidated bank. Hence, the assets and liabilities of the First National Bank in St. Louis were vastly different from those of the Third National Bank. Its stockholders were a different body, and the taxpayer held a different proportional interest in the consolidated bank than he had held in the Third National. The liabilities of the stockholders were different; the volume of the business was different; the customers were different. This difference was not such as results from a stock dividend. * * *

"Confessedly, his interest in the $250,000 represented an interest, which he had had in the Third National Bank, but which he did not have in the First National Bank in St. Louis. In other words, after the consolidation his interest represented a different interest than that held by him prior thereto. We are of the view that the exchange in the instant case was not in the nature of a stock dividend. * * *

"The gain here sought to be taxed was represented by shares with essentially different characteristics in an essentially different corporation, and hence the added value, although still held by the taxpayer, is taxable income."

■ Turning to the case at bar, it appears from the findings of the Board of Tax Appeals that the Union Company had common stock only. The Union Power & Light Company had both common and preferred stock, one million of each. Each stockholder in the Union Company received in exchange for his stock in that company a portion of the 10,000

146

shares of common stock of the Union Power & Light Company, and a portion of 2,500 shares of the preferred stock in that company; the portion received of each being proportionate to his holding of stock in the Union Company. But as part of the same reorganization transaction, the Union Power & Light Company also sold to the public at large, 2,500 shares of preferred stock for $100 per share.

Conceding but without deciding that the corporate identity was maintained and that the business to be carried on remained the same, yet we think that the financial structure of the corporation was materially changed and that the interest of each stockholder of the Union Company in the business and the assets was essentially different after the transaction from what it was before.

A common stock, subject to a priority of $500,000 preferred and a cumulative $35,000 annual dividend charge, is essentially different from a common stock subject to no priority of preferred stock; especially when the preferred stock is not wholly acquired ratably by the old common stockholders, and is preferred in participation, not only in dividends but also in the assets of the corporation upon dissolution or sale.

We conclude that the proper basis for determining the gain acquired by respondent Kountze upon the sale in 1923 of his stock in the Union Power & Light Company was the value of said stock at the time it was received by him in 1917.

We think the decision of the Board of Tax Appeals was right. It is affirmed, and the petition for review is dismissed.