## COMMISSIONER OF INTERNAL REVENUE v. MERRELL.

## MERRELL v. COMMISSIONER OF INTERNAL REVENUE.

### No. 20.

Circuit Court of Appeals, Second Circuit. Dec. 6, 1937.

Robert J. Heberle, of New York City, for respondent.

James W. Morris, Asst. Atty. Gen., and Sewall Key and Harry Marselli, Sp. Assts. to Atty. Gen., for petitioner.

Before MANTON, SWAN, and CHASE, Circuit Judges.

CHASE, Circuit Judge.

In 1909, the taxpayer's father died testate. His will was duly allowed by the courts of the state of New York. By its provisions the residuary estate was left in trust for the benefit of the widow, three sons, of which the taxpayer was one, and some grandchildren. The widow having died in 1911, the property in trust was distributed with the exception of certain shares of the capital of Merrell-Soule Company. The interests of the grandchildren were satisfied, and thereafter the three sons who were the executors under the will and the sole trustees were also the sole beneficiaries of the trust. The pertinent provisions of the will follow:

"Article Eleventh. Upon the death of my wife, I hereby will and direct that the entire principal of said fund and all of my said estate shall be equally divided among my sons: Irving S. Merrell, Lewis C. Merrell and Oliver Edward Merrell, ex-

cept my stock in the Merrell Soule Company.

"Article Twelfth. I further will and direct that my stock in the Merrell Soule Company shall be held by my executors and trustees hereinafter named or their survivors during the life time of my son, Oliver Edward Merrell, and the income or dividends therefrom shall be equally divided between my sons: Irving S. Merrell, Lewis C. Merrell and Oliver Edward Merrell, and on the decease of my son, Oliver Edward Merrell, said stock shall be equally divided into three parts between my sons: Irving S. Merrell and Lewis C. Merrell, their heirs, executors or administrators and the executor or administrator of the estate of Oliver Edward Merrell, share and share alike.

"Article Thirteenth. I further will and direct that none of my said sons shall in any manner sell or dispose of any of said stock or any interest therein unless he shall first have offered it to both or either of the others of my said three sons at a price not to exceed the par value thereof, and given to each of the others an option to purchase the same at said valuation for a period of ninety (90) days, and that in case any of my said sons shall desire to sell his interest in said stock, the other shall be given the privilege to purchase the same in equal amounts, except that I hereby will and direct my executors and trustees hereinafter named to convey to one of themselves enough stock of said Company to enable the holder thereof to qualify as a Director of said Merrell Soule Company.

"Article Fourteenth. I further will and direct that in case it shall seem advisable to each and every one of my said three executors and trustees hereinafter named to dispose of said stock, they shall have the privilege of so doing, provided, however, that all three of them shall agree as to the advisability of such sale.

"Article Fifteenth. In case of the death of my said sons, I hereby will and direct that the survivor or survivors shall have the privilege of purchasing the interest in said stock from the estate or estates of the deceased at its fair market value or if a market can not be determined, at such value as may be shown by a fair and reasonable inventory of said Company's property."

The trust was never terminated by the death of Oliver Edward Merrell, who is still living, but was otherwise brought to an end. The three trustees, acting under the provisions of article 14 above quoted, decided to dispose of the stock by sale, and did on December 20, 1919, sell to each of themselves one-third, 875 shares, at the par value of $100 per share. The transfer agent of Merrell-Soule Company refused to recognize the transaction as a sale and to transfer the stock. Thereupon a suit was brought in the Supreme Court of the state of New York which resulted in a final order upholding the sale and directing the transfer of the stock to the purchasers. The transfer was then made. Each son had given his promissory note to the trustees for the purchase price, and in 1928 the trustees, upon their petition to the Surrogate's Court of Onondaga County, N. Y., secured an order of discharge and distribution. They then distributed the notes to the makers, and the trust was formally terminated.

Having thus acquired the 875 shares of Merrell-Soule stock, the petitioner exchanged them in 1928 for shares in the Borden Company pursuant to a plan of reorganization which the parties agree gave to the Borden shares whatever may have been the basis of the Merrell-Soule shares. In 1930, the petitioner sold the Borden Company shares. It has been stipulated that the March 1, 1913, fair market value of the Merrell-Soule shares was $333.91, and on December 20, 1919, it was $800 per share. The issue presented is what is the proper cost basis of the Merrell-Soule shares in determining gain or loss on the sale of the Borden Company shares in 1930, since the latter is to be given the basis of the former. The taxpayer contends that it is the fair market value on December 20, 1919. The Commissioner contends that it is the par value for which the trustees sold, and was upheld in this by the board member who heard the petition. Upon review by the full board, however, the March 1, 1913, fair market value was determined to be the basis with five members dissenting.

■ Although it is apparent that the December 20, 1919, sale of the stock to the testator's sons was made by themselves as trustees to themselves as individuals who were the sole beneficiaries and so not a transaction at arm's length, we, of course, accept the decision of the New York court that it was an actual, valid sale. This makes it necessary to take it as established

that the taxpayer acquired the Merrell-Soule shares in 1919 by purchase. Indeed, there could have been no other method of acquisition under the terms of the will save by termination of the trust at the death of Oliver, an event then in the future and now impossible, since the trust is no longer in existence. Although the Board based its decision in part upon the ground that under New York law there was before March 1, 1913 a merger of legal and equitable interests, Greene v. Greene, 125 N. Y. 506, 26 N.E. 739, 21 Am.St.Rep. 743, which in effect placed the legal title to the stock in the taxpayer who thus acquired it then by bequest, we find it impossible to accept that conclusion in view of the binding decision of the New York court above mentioned. And so we must discard the March 1, 1913, fair market value as an untenable basis.

The taxpayer leans heavily upon Robinson v. Commissioner (C.C.A.) 59 F.2d 1008, in support of his theory that the cost of the stock was the $100 per share which he ostensibly paid for the shares plus the then value of his right under the will to have it offered to him at par before it should otherwise be sold. He asks us to agree that the par value plus the right equalled the fair market value of $800 per share and was in fact the cost to him. This does at first seem plausible in view of the Robinson case. But the support will not stand up under anaylsis. Robinson paid for the Libbey Glass Company stock not only the money price of $200 per share, but also refused the offer of employment elsewhere and remained with the Libbey Company. It was to induce him to remain that the opportunity to buy stock at the favorable money price was provided, and his refusal to leave was a part of the cost of the shares he bought.

Here the same reasoning might apply had the taxpayer had any right to purchase the stock at par from the trustees which he relinquished in addition to giving his note when he made the purchase. We cannot find, however, that he did. Article 14 of the will contains no limitation upon the price at which the trustees might sell the stock. It merely provides that they might "dispose of" it, provided "all three of them shall agree as to the advisability of such sale." Doubtless it was thought that the provision for unanimity was sufficient protection for each son

as to the price. When the will took effect, the three executors who later became the trustees were not the sole beneficiaries, so the article was not mere verbiage.

Article 13 restricts the right of the sons to "sell or dispose of any of said stock or any interest therein," unless it should first be offered to the other sons at par and the offer held open for ninety days, with the additional requirement that, if any son should "desire to sell his interest in said stock, the other(s) shall be given the privilege to purchase the same in equal amounts." In terms this article restricts the sale by no one but the sons. Its language presupposes that any son desiring to sell the stock or any interest in the stock had acquired the stock or the interest to be sold. In that event, the rights of the other sons to buy such interest, whether it might be complete ownership or merely the equitable interest of the beneficiary of the trust, at the par value of the stock were created. But that this restriction applied only to the sale by son or sons to son or sons is disclosed not only by the language used when read alone but also when contrasted with that of article 14 and that of article 15, which gave a son or sons surviving one or more deceased sons the privilege of buying stock from the "estate or estates of the deceased" not at par value but at fair market value. Thus different provisions by way of restriction upon the sale, and correlatively by way of right to buy, were made when a son should desire to sell, when the trustees should desire to sell, and when the estate of a deceased son should sell.

The taxpayer had the right to prevent any sale by the trustees by withholding his assent under article 14. But he had no right to compel the trustees to sell to him at par under article 13. He acquired that right by the agreement for the sale which took place at par because the trustees agreed to sell and the sons agreed to buy at that price. What was in fact done should determine the tax liability. Remington Rand, Inc. v. Commissioner, 33 F. 2d 77 (C.C.A.2); United States v. Phellis, 257 U.S. 77, 42 S.Ct. 63, 66 L.Ed. 180. This taxpayer in fact paid only $100 per share for his Merrell-Soule stock, and that should be taken as the basis for determining gain or loss on the Borden Company stock, since it is what it actually cost him.

Reversed.