FOX RIVER PAPER COMPANY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 20878. Promulgated August 22, 1933.

*Edward J. Dempsey, Esq.*, and *A. E. James, Esq.*, for the petitioner.

*W. Frank Gibbs, Esq.*, for the respondent.

1187

1188

1190

1194

OPINION.

McMAHON: The determination of two of the questions involved in this proceeding—(1) whether the petitioner is entitled to a deduction on account of depreciation on the property here involved from June 8, 1920, to December 31, 1920, and (2) whether the petitioner is entitled to a deduction of a loss claimed to have been sustained on account of the abandonment in 1920 of certain machinery and equipment here involved—is dependent upon the construction of the contracts of June 8, 1920, and January 3, 1921, entered into by the petitioner and the Kimberly-Clark Co., hereinafter referred to as the seller.

The respondent contends that the contract of June 8, 1920, constituted an executory contract providing for the sale of the mill on January 1, 1921, or a "memorandum or binder of the transaction"; that the "land contract" of January 3, 1921, executed January 20, 1921, effected the transfer of title to such property; and that therefore the petitioner, not being the owner of such property until January 1921, is not entitled to deduct from gross income for the year 1920 any loss on account of abandonment of machinery and equipment covered by the agreement of June 8, 1920, or depreciation on account of the buildings, machinery, and equipment. The petitioner contends that the sale was made on June 8, 1920, and that it was the owner of such property as of that date and is entitled to such deductions.

We will consider first the question as to whether the petitioner is entitled to deduct $103,524.92 from gross income of 1920 on account of abandonment of certain machinery, tools, and equipment covered by the agreement of June 8, 1920, under the provisions of section 234 (a) (4) of the Revenue Act of 1918, which is as follows:

Sec. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\* \* \* \* \* \* \*

(4) Losses sustained during the taxable year and not compensated for by insurance or otherwise. \* \* \*

In its petition filed with the Board on October 28, 1926, the petitioner alleges that it sustained a loss in 1920 through abandonment and scrapping of machinery and equipment purchased from the Kimberly-Clark Co., as follows:

| | |
|---|---|
| Electrical machinery | $74,513.22 |
| Fourdrinier part of paper machine | 18,482.34 |
| Miscellaneous machinery | 45,717.94 |
| Machinery lost or stolen | 2,024.05 |
| | 140,737.55 |

In a stipulation filed July 9, 1931, the parties stipulated, relative to the question of abandonment and scrapping of machinery and equipment, the following:

1. That on June 8, 1920, the Petitioner and the Kimberly-Clark Company entered into an agreement for the purchase and sale of certain property known as the Telulah Mill, situated at Appleton, Wisconsin, for a total consideration of $950,000.

3. That included in the said purchase was mill machinery and equipment which cost $492,688.23, included in the above named consideration.

5. \* \* \* In the event that the Board shall determine that the Petitioner is entitled to a deduction of $103,524.92 for machinery and equipment scrapped during the year 1920, the basis for the computation of a reasonable annual allowance for exhaustion, wear and tear of mill machinery shall be reduced by the said $103,524.92. \* \* \*

8. That Petitioner scrapped and discarded machinery and equipment which cost net $103,524.92, after the allowance for the scrap value thereof. The said $103,524.92 was included in the consideration of $950,000, as hereinabove stated.

9. \* \* \* The Commissioner did not allow any deduction in 1920 for loss due to scrapping of machinery and equipment in the amount of $103,524.92, or any other amount.

Although the respondent in his answer denies the allegations contained in the petition relative to the abandonment and scrapping of machinery and equipment, it appears quite clearly from the stipulation that the petitioner satisfied the respondent that machinery and equipment costing net $103,524.92, after the allowance for scrap value, had actually been scrapped and discarded by the petitioner

and that they were a part of the machinery and equipment purchased from the Kimberly-Clark Co. The machinery and equipment scrapped and discarded consisted of the wet end or Fourdrinier part of one of the paper machines, the electrical equipment, including generator, motors, rope drive, and other miscellaneous machinery, tools and equipment.

The respondent contends that no deductible loss can be claimed in 1920 on account of abandonment of this machinery and equipment, since the petitioner was not the owner of such property in that year, and that the petitioner did not in fact abandon such machinery and equipment in 1920, but in the following year or later.

The agreement of June 8, 1920, provides that:

The Seller hereby agrees that it will sell and convey to the Buyer all its waterpower * * *, and all its land and mills * * * in said Appleton, * * * for the sum of Nine Hundred Fifty Thousand Dollars * * *.

* * * * * * *

The Seller is to retain possession and use of said property until January 1, 1921, the Seller then to surrender possession * * *.

Notwithstanding the fact that the Seller retains general *possession and use* of said property until January 1, 1921, yet in the meantime Buyer *shall have the right* to make such improvements to such property as may be desirable for its purposes, and as may not interfere with full operation of the paper mill plant by the Seller.

* * * * * * *

It is understood that all *tools and machinery* in use in the operation of the mill property conveyed *shall pass to and be the property of the Buyer.* [Italics ours.]

The contract of June 8, 1920, deals with two kinds of property, viz., (1) water power and land, including buildings, and (2) *tools and machinery.* Neither the land contract nor the deed dated February 5, 1926, mention the "*tools and machinery*" referred to in the contract of June 8, 1920.

Under the provisions of the contract above quoted the seller reserved to itself the right to use and operate the "paper mill plant" and the petitioner acquired the right to enter upon the property and make such improvements thereon as might be desirable for its purposes, without interfering with the full operation of the paper mill plant by the seller. The paper mill plant did not constitute the entire property conveyed. While the seller was operating the paper mill plant, the petitioner built a new large ironclad warehouse. It entered into a contract for remodeling the "old Pulp Mill and Rotary Building" into a new rag room and for the building of a filter plant, both of which were to be completed in 1920. It laid cement floors and made other improvements, all while the seller was operating the paper mill plant. The seller therefore used so much of the Telulah Mill property as was necessary for the "full opera-

tion of the paper mill plant" while the petitioner was active upon the remaining property making it suitable for its purposes.

Although the contract did not expressly provide what machinery and equipment the seller was to use in the operation of the paper mill plant, obviously it implies, and it appears, that the parties contemplated that the seller was to use all the machinery and equipment necessary to operate the paper mill plant; and the seller did use such machinery and equipment in the operation of the mill.

While it clearly appears therefore that the seller was to use the machinery and equipment and that there was to be no interference on the part of the petitioner in its use thereof for the operation of the paper mill plant, yet the contract provides that "*all tools and machinery* in use in the operation of the mill property conveyed *shall pass to and be the property of the Buyer.*" It seems to us that the clear import of the above quoted provisions of the contract, viewed in the light of all the facts and circumstances, is that, notwithstanding the reservation of the *possession and use* of the paper mill plant, together with the tools and machinery, nevertheless, title to the tools and machinery was to pass to the petitioner upon execution of the agreement of June 8, 1920. This is substantiated by the fact that the petitioner, after the seller vacated the plant, within a few days after December 17, 1920, took possession and exercised all the rights of ownership thereof without objection from or interference by the seller. As early as September 1920, the seller had knowledge of the fact that petitioner was trying to dispose of the electric motors and other electrical equipment, as it was offered for sale to the seller by the petitioner (the buyer) and negotiations were had between them for the repurchase thereof by the seller, while the seller was still operating the paper mill plant. Obviously, the petitioner acquired possession of the machinery, equipment, and tools in 1920, and, as shown later, exercised complete dominion and control thereof.

Furthermore, the petitioner in 1920 paid $450,000 of the purchase price of $950,000, $400,000 of which was not payable under the terms of the contract of June 8, 1920, until January 1, 1921. The seller permitted the petitioner to paint all the buildings, including the paper mill plant, in a distinctive color scheme according to custom established by the petitioner, thus permitting the property to bear publicly the petitioner's indicia of ownership. The contract provided that the petitioner "shall have the right" to make improvements upon the property and the petitioner, without any objection on the part of the seller, placed valuable and substantial improvements on the property in 1920. A few days after December 17, 1920, the petitioner had, as stated before, possession of the entire

property and exercised all the rights of ownership relative thereto without objection on the part of the seller.

The principle that, in applying the provisions of the Sixteenth Amendment and the income tax laws enacted thereunder, matters of substance or the actualities of the situation or what was actually done should be regarded rather than mere form has been repeatedly enunciated by the courts and this Board. *Weiss* v. *Stearn*, 265 U.S. 242; *United States* v. *Phellis*, 257 U.S. 156; *Robert C. Roebling*, 28 B.T.A. 644; *W. E. Guild*, 19 B.T.A. 1186; *William H. Mullins*, 14 B.T.A. 426; *B. F. Saul*, 4 B.T.A. 639; *Anna M. Harkness*, 1 B.T.A. 127.

Taking into consideration only what was done by the parties in 1920 in carrying out the terms of the contract, no other conclusion than that the petitiner became the owner of such machinery, tools, and equipment in 1920 can reasonably be reached.

The Board has held, in *Reuben H. Donnelley Corp.*, 26 B.T.A. 107; *I. G. Zumwalt*, 25 B.T.A. 566; *Belridge Oil Co.*, 11 B.T.A. 127, that whether or not there has been an abandonment depends on the intention of the owner, coupled with the act of abandonment, both to be ascertained and determined from all the facts and surrounding circumstances.

All of the property was purchased by the petitioner with the intention of using it in the operation of its business, with certain changes to make it suitable for the manufacture of paper from rags. After the execution of the agreement in 1920, the petitioner discovered that certain of the machinery and equipment was not in condition for its use and not suited for its purpose. Thereafter and in the same year the petitioner incurred substantial obligations in the purchase of machinery and equipment to replace that which it found unsuitable for its purpose. In two letters of the seller, dated December 17, 1920, addressed to the petitioner, the seller stated:

As soon as shut down, [within a few days thereafter] and, as a matter of accommodation to you, * * * we have no objection to your beginning repairs and remodeling over the entire mill * * *.

Under the circumstances we will be very glad to permit you to go ahead with your plans in the repairs and remodelling * * *.

A few days after the date of the above letters the seller turned over the paper mill plant to the petitioner. As soon as it was able to do so and immediately upon the vacating of the paper mill plant by the seller, the petitioner commenced and practically completed in 1920, the work of dismantling and removing from the plant the machinery and equipment which it did not intend to use. It disposed of such of it as it could at scrap value and the rest was thrown out or stored.

It is our conclusion that the petitioner did sustain a loss in the amount of $103,524.92 in 1920 and that such loss is deductible under section 234 (a) (4) of the Revenue Act of 1918. *Parma Co.*, 18 B.T.A. 429; *Winter Garden, Inc.*, 10 B.T.A. 71; *Peoples Ice & Cold Storage Co.*, 10 B.T.A. 16; *Union Bed & Spring Co.* v. *Commissioner*, 39 Fed. (2d) 383; *Wheeling Tile Co.* v. *Commissioner*, 25 Fed. (2d) 455.

The fact that the petitioner in 1923 or 1924 sent the rotor of the electrical equipment to the manufacturer does not refute, under the circumstances, the intention to abandon it in 1920. The rotor was returned to the petitioner without charge, and placed in its warehouse, where it has remained ever since. This confirms the petitioner's claims that it was unsuitable and could not be utilized for its purposes or otherwise. *Wheeling Tile Co.* v. *Commissioner, supra.* See also *Independent Brick Co.*, 11 B.T.A. 862, 867.

In view of the stipulation entered into between the parties, it seems to us that the argument of the respondent that " The burden of proof was also upon the taxpayer to allocate the $103,524.92 representing the cost of scrapped and discarded machinery and equipment to the three items " is without merit. The machinery and equipment scrapped and discarded consisted of more than three items, but was referred to as part of a paper machine, electrical equipment consisting of various motors and other parts, and miscellaneous machinery and equipment. We fail to see how the respondent could have entered into a stipulation fixing the total cost of machinery and equipment abandoned without considering the kind, nature and character of the various machinery and equipment involved. It is impossible to determine cost without knowing what the article is, the cost of which is to be determined. These stipulations are entered into for the convenience of the parties and to eliminate long and detailed proof of facts which can more readily, and with a saving of time, effort and expense, be determined by the parties themselves. In view of the agreements reached in the stipulation we are of the opinion that the petitioner has not failed in his proof in not allocating the total cost stipulated to the various items of machinery and equipment abandoned and scrapped. In our opinion, under all the facts and circumstances, the petitioner was justified in relying upon the stipulation to the extent to which it did rely upon it.

Since we have held that the petitioner is entitled to a deduction of $103,524.92 in 1920, on account of the loss by abandonment of machinery, tools and equipment, under paragraph 5 of the stipulation, we are not here concerned with the question of a deduction on account of depreciation in that year of such property; and in what

follows herein upon the subject of depreciation, our discussion is limited to the remainder of the property covered by the agreement of June 8, 1920, exclusive of the land and water power.

The next question we will consider is whether the petitioner is entitled to a deduction of a reasonable amount for depreciation of the buildings, machinery, tools and equipment exclusive of the machinery, tools and equipment abandoned in 1920, under section 234 (a) (7) of the Revenue Act of 1918, which is as follows: ·

SEC. 234. (a) That in computing the net income of a corporation subject to the tax imposed by section 230 there shall be allowed as deductions:

\*      \*      \*      \*      \*      \*      \*

(7) A reasonable allowance for the exhaustion, wear and tear of property used in the trade or business, including a reasonable allowance for obsolescence;

The contract of June 8, 1920, provides in part that:

The Seller is to retain possession and use of said property until January 1, 1921, the Seller then to surrender possession \* \* \*.

The Seller shall maintain the property in good operating condition and in as good condition as the same now is, until the first day of January, 1921, *excepting ordinary wear and tear and decay.* [Italics ours.]

It is to be noted that the property involved is not property which was not subject to depreciation between June 8, 1920, and the date of delivery under the contract. On the contrary, the contract covered property which had been in use prior to June 8, 1920, and, under the terms of the first contract, such property was to be used thereafter for about seven months by the seller in the operation of the mill. Furthermore, the transaction was a business transaction, the parties dealing with each other at arm's length and in the ordinary course of business. The president of the seller, who acted throughout the negotiations in behalf of the seller, testified that:

\* \* \* We were reluctant to consider the sale of it, because we had contracts carrying us through the year, which put all of our equipment to its utmost capacity to fill; so that to discharge our obligations under the contracts we could not possibly consider the sale of the mill for delivery earlier than the 1st of January.

Negotiations for the purchase and sale of the property were commenced early in 1920 and such negotiations finally resulted in the agreement of June 8, 1920. The petitioner had orders substantially in excess of the capacity of its facilities and it was desirous of increasing its facilities as soon as possible to meet its contract obligations. The position of both parties in this respect is reflected in the provisions of the contract, the seller reserving the right to use and operate the mill and the petitioner having the right to enter

upon the property and " *to make such improvements to such property as may be desirable for its purposes* and as may not interfere with full operation of the paper mill plant by the Seller." [Italics ours.] The president of petitioner viewed the property at the time of the negotiations and execution of the first contract, and knew that as to that part of the property referred to in the contract of June 8, 1920, as the " paper mill plant ", it would not, under the circumstances, be delivered to it in the same condition as it was in on June 8, 1920. The condition, at the time of delivery, of the property which was subject to the use of the seller over a considerable period of time would be a matter of grave concern to the petitioner. That this matter did not escape the attention of the petitioner is evidenced by the above quoted paragraph which describes the condition in which the property was required to be in at the time of delivery, i. e., the same good operating condition as of June 8, 1920, " *excepting ordinary wear and tear and decay.*" [Italics ours.] The president of the seller further testified that between June 8, 1920, and the end of the operation of the mill by it, it had made a profit in " round figures, $200,000 " from the operation of the mill. To retain the use and possession of the property was of substantial value to the seller, and, since the petitioner was desirous of obtaining the use and possession thereof as soon as possible, the delay therein would be a disadvantage to it in that it was unable to prepare and use the property for its own purposes as rapidly and as soon as it would have been able to do had it secured the immediate delivery of the property. Certainly all of these factors entered into the determination by the parties of the consideration to be paid for the property by the petitioner. It would be unreasonable to say that the seller, in view of the condition of its business at the time and its need for the utmost capacity of all its facilities, would have fixed the same price for the property as stated in the contract of June 8, 1920, had it been required to deliver the property on June 8, 1920, or shortly thereafter. It would not be reasonable to say that the petitioner would have agreed to pay the same purchase price for the property irrespective of the time of delivery and use thereof by some one other than itself. The officers of both the seller and the petitioner, who negotiated this deal and who acted on behalf of their respective corporations, were men of wide business experience. They certainly would know and realize that the value of the property was greater on June 8, 1920, than on January 1, 1921, to the extent of the depreciation caused by the use thereof by the seller and lapse of time. It seems to us that the conclusion is inescapable that the property actually purchased by the petitioner was the property in its condi-

tion at the time of delivery, i. e., the property in good operating condition and in as good condition as the same now is [June 8, 1920], " * * * *excepting ordinary wear and tear and decay.*" [Italics ours.] Hence, since the petitioner contracted to buy the property in its condition as of January 1, 1921, or in as good operating condition as of June 8, 1920, minus or excepting wear, tear, and decay, it cannot be said that the property purchased was subject to any depreciation which would have to be borne by the petitioner during the period between June 8, 1920, and January 1, 1921, or that its investment was being reduced, since its investment represented the property as of January 1, 1921. As to the condition of the property now under consideration, the petitioner bought it in its depreciated condition as of January 1, 1921. Therefore, it did not experience, suffer or sustain any depreciation of the property before that date. As a matter of pure fact it had no depreciation on the property in 1920 and hence it cannot deduct any depreciation of the property for that year.

In view of the foregoing, it is not necessary to determine, for purposes of depreciation, whether the petitioner was the owner of the property as of June 8, 1920; nor is it necessary to determine whether or not such property was " used in the trade or business " within section 234 (a) (7).

All the cases cited by the petitioner and respondent have been carefully considered, but the facts in those cases are so different from the facts in this proceeding that it would serve no useful purpose to enter into a discussion of them. We base our decision on the peculiar facts of this proceeding.

It is our conclusion, therefore, that the petitioner is not entitled to a deduction in 1920 for depreciation of the buildings, machinery, tools, and equipment not covered by our disposition of the issue of abandonment.

As the respondent confessed error as to the disallowance of a deduction for income taxes due the State of Wisconsin for the year 1920 in the sum of $20,599.97, such sum, as well as the item of $13,543.37 which parties stipulated should be allowed as ordinary necessary expenses for the year 1920, should be deducted upon recomputation under Rule 50.

Redetermination of petitioner's income and profits taxes for 1920 was made by respondent under the provisions of sections 327 and 328 of the Revenue Act of 1918. On motion of respondent, the hearing was limited to the issues defined in paragraph (a) of Rule 62. Therefore, no evidence with respect to assignments of error numbered 4, 5 and 6 was adduced at the hearing. Unless motion for

hearing under Rule 62 (a), to be filed within 30 days, is granted by the Board.

Reviewed by the Board.

*Judgment will be entered under Rule 50.*

SMITH, BLACK, and MATTHEWS concur in the result.

MARQUETTE dissents.

TRAMMELL dissents on the question of depreciation.

VAN FOSSAN dissents on the question of the ownership of machinery.