JOHN THOMAS SMITH, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 65717, 71888, 75858. Promulgated August 15, 1939.

388

*David Sher, Esq.*, for the petitioner.
*C. H. Curl, Esq., J. E. Marshall, Esq., T. F. Callahan, Esq., Frank D. Strader, Esq.*, and *Allen Akin, Esq.*, for the respondent.

## OPINION.

MURDOCK: The respondent has filed two briefs in this proceeding, but in neither brief does he advance any argument in support of his determination that the sales of securities to the petitioner's wife in 1931 were lacking in bona fides, were ineffective to entitle the petitioner to deductions for losses, or were an indication that a part of the deficiency for 1931 was due to fraud with intent to evade tax. The closest scrutiny fails to reveal any reason why those sales should be regarded as lacking in bona fides, as being ineffective to entitle the petitioner to the deductions which he claimed, or to indicate that any part of the deficiency for 1931 was due to fraud with intent to evade tax. Further discussion of those transactions seems unnecessary.

This leaves for consideration only the transactions between the petitioner and his wholly owned corporation, Innisfail, involving the ownership by Innisfail of Chrysler, Hudson, and Aldebaran stock. Two general issues are involved. The first is whether the transactions were mere shams so that the petitioner's claims of losses and his failure to report the dividends on the stock show an intent upon his part to defraud the Government of taxes legally due from him. The

respondent has the burden of proof on that issue. The second is whether the petitioner correctly returned his income. The petitioner has the burden of proof on that issue.

The Commissioner filed his original brief on December 19, 1936, but made no argument whatsoever in that brief to support his determination that a part of the deficiency for 1931 was due to fraud with intent to evade tax. Fraud for the other years had not been suggested at that time. Thereafter, the fraud issue was raised for the other two years by amended answers at the separate docket numbers for those years.

The fraud issue is whether any part of the deficiency for any of the years 1929, 1930, or 1931 was due to fraud with intent to evade tax. Facts relied upon to support fraud must be alleged as well as proven. The facts alleged by the respondent in these proceedings to support his charges of fraud consist only of the sales to the wife, the sales of Chrysler, Hudson, and Aldebaran stock to Innisfail, and the failure of the petitioner to report the dividends upon the Chrysler and Hudson stock. All of those circumstances have been considered carefully, as well as all other transactions which bear in any way upon them. Obviously, the discussion must be limited to the more significant events—but none has been overlooked. The cases cited by the respondent upon the fraud issue are not in point, some because they involved only attempted reorganizations, others because they show an improper use of control over the corporation. This case involves neither an attempted reorganization nor improper control over Innisfail.

The petitioner has testified that he honestly believed that he had a right to make the sales to the corporation and to take the deductions for losses resulting from those sales, and was not required thereafter to report the dividends on the securities sold. There is no evidence in the record which, in our opinion, can be regarded as indicating the contrary. If he did not have this belief and if he did not intend to transfer the securities to Innisfail, it is difficult to understand his actions. Although he was trying to keep down his taxes, all of his acts indicate that he was endeavoring to meet the requirements of the law. He thought his plan was effective and it never occurred to him to go beyond the legal effect of his acts to avoid tax by means of fraud or deception. His view was not unreasonable, and even if it were wrong, his belief in it would exonerate him from any charge of fraud. *Rogers Recreation Co.* v. *Commissioner*, 103 Fed. (2d) 780; *Peterson & Pegau Baking Co.*, 2 B. T. A. 637, 640; *J. S. McDonnell*, 6 B. T. A. 685, 695; *George L. Rickard*, 15 B. T. A. 316, 317; *Landers Brothers Co.*, 17 B. T. A. 1078, 1081; *James Nicholson*, 32 B. T. A. 977, 988, 989. There is no indication that he ever misrepresented any fact, withheld

any information, or resisted or prevented the discovery by the Commissioner of any pertinent fact. The Commissioner does not claim that he has been misled.

Since the transactions in question were between the petitioner and his wholly owned corporation, they must be carefully scrutinized for the purpose of determining that the petitioner took no improper advantage of his power over the corporation and that the transactions were what they would seem to be upon a less intensive examination. The transactions have been subjected to careful scrutiny.

The respondent argues that the separateness of Innisfail should be ignored for tax purposes in this proceeding. The facts show that Innisfail was regularly incorporated and was a separate legal entity from the petitioner. The respondent does not contend otherwise. He merely contends that the separate corporate entity should be disregarded for income tax purposes. Yet he, himself, has not disregarded the separateness of Innisfail for income tax purposes but has treated Innisfail as a separate taxable entity. The corporation had many admittedly legitimate transactions and may not be disregarded for tax purposes. See *Smith* v. *Higgins*, 102 Fed. (2d) 456, which involved Innisfail and the present petitioner.

The Commissioner requested in his final brief a finding that the petitioner "transferred by bill of sale to said corporation [Innisfail] 5,005 shares of Chrysler preferred stock then held by Bassett for 97 shares of Innisfail capital stock, together with the option right granted by the exchange agreement of June 2, 1925." That finding is a proper one and it shows that Innisfail was the owner of the 5,005 preferred shares and of the right under the option. Innisfail then exercised the option and exchanged the 5,005 shares of preferred for 26,477 shares of Chrysler common stock. Thus it became the owner of the 26,477 shares of Chrysler common stock in 1926. The remaining Chrysler shares were purchased by subscription in 1928. Only the Hudson and Aldebaran shares were purchased directly from the petitioner.

The respondent argues that Innisfail paid no consideration to the petitioner for any of the shares. Innisfail issued its own stock in exchange for the Chrysler preferred and the option right, and it can not be forcefully argued that there was any lack of consideration for that transfer. The Chrysler common was not acquired from the petitioner but was acquired by exercising the option and exchanging the preferred for the common. Clearly Innisfail became the owner of those common shares and there is no basis for any argument that it failed to pay proper consideration for them. The petitioner advanced the subscription price for the 4,412 Chrysler common shares acquired in 1928 and charged Innisfail with the amount of that

advance on his books. A corresponding entry was made upon the books of Innisfail to show that it owed the amount to the petitioner. Innisfail purchased the Hudson stock and the Aldebaran stock directly from the petitioner and entries were made upon its books and upon the books of the petitioner to show that it owed the petitioner the purchase price of those shares. Consideration can move from a purchaser to a seller by means of debits and credits upon the books of the two parties without the actual transfer of any funds. Although mere bookkeeping entries are not controlling, nevertheless, where they are in accordance with the facts and show correctly a course of dealing between two parties, and where the parties fully discharged their obligations as shown on the accounts, there would seem to be no reason for failing to give full recognition to the effect of the accounting entries. The books of the petitioner and of Innisfail were accurately kept, were accorded complete respect by both parties, and were just as effective for all practical purposes as any accounts between separate entities doing business with each other would be. The debit balance in those accounts was sometimes in favor of one of the parties and was sometimes in favor of the other. No interest was charged upon the debit balances, but this point is not pressed and is not of sufficient importance to materially weaken the evidentiary value of the accounts. The accounts reflected the actual financial situation existing between the parties. The entries showing that Innisfail owed the petitioner the purchase price of the stocks above mentioned were in due course completely offset by other entries showing that the petitioner owed money to Innisfail. Thus it can not be argued successfully that there was any lack of consideration for the transfers of the Chrysler, Hudson, and Aldebaran stocks. The discussion above in regard to the accounting for the purchase price of securities which the petitioner sold to Innisfail applies with equal force to the method of crediting to Innisfail the dividends on the Chrysler and Hudson stock.

The respondent also argues that the sales of Chrysler and Hudson stock were incomplete because the petitioner retained the certificates in his own name and never made any delivery to Innisfail. This argument is not made in the case of the Aldebaran stock because the certificates for that stock were transferred to the name of Innisfail. The petitioner admits that the certificates for the Chrysler and Hudson stock were at all times material hereto in his name and that certificates were never issued in the name of Innisfail. He explained why he kept those particular certificates in his own name. He was the only person active in the affairs of Innisfail. He testified that corporations generally hold listed securities not in the name of the corporation, but in the name of an individual, in order to avoid the incon-

venience of making documentary proof of ownership and authority to transfer which is required when a corporation attempts to sell a listed security standing in its own name, and he had the same purpose in regard to the listed securities of Innisfail. The Board is not unfamiliar with this practice. *Rands, Inc.*, 34 B. T. A. 1094, 1106. The petitioner further explained that the Aldebaran stock was not listed, there was no reason for not having the certificates in the name of the true owner, and, therefore, certificates for that stock were issued in the name of Innisfail. Delivery is not always necessary in the case of sales of shares of stock, and the state law in regard to delivery is not necessarily controlling for income tax purposes. *Dee Furey Mott*, 35 B. T. A. 195; affd., 103 Fed. (2d) 1009; *C. R. Dashiell*, 36 B. T. A. 313; affd., 100 Fed. (2d) 625; *Ruml* v. *Commissioner*, 83 Fed. (2d) 257. However, the petitioner made such delivery as was reasonable under the circumstances. He segregated and marked the securities belonging to Innisfail to indicate ownership by Innisfail. The respondent does not deny this. The petitioner thereafter held those certificates for Innisfail and never did anything inconsistent with or in violation of Innisfail's ownership of the shares. He executed bills of sale transferring the Chrysler preferred and the Hudson stock to Innisfail. Cf. *Estate of James F. Foster*, 13 B. T. A. 496. If there had been some other person active in the affairs of Innisfail, he might have placed the Chrysler and Hudson stock in the name of that person as a nominee. The circumstance that the listed securities belonging to Innisfail were represented by certificates in the name of the petitioner seems relatively unimportant in the light of all of the facts.

The intention of the parties is more important than delivery. *Dee Furey Mott, supra; Hoffman* v. *Commissioner*, 71 Fed. (2d) 929; *Walter F. Henningsen*, 30 B. T. A. 301. The intent of the petitioner to have Innisfail acquire complete legal title to and ownership of the shares appears in a number of ways. The petitioner has testified that such was his intention. He wanted Innisfail to have the original preferred shares so that it could realize the profit from the exchange and so that he would not realize that profit. He also wanted Innisfail to acquire title to the Hudson and Aldebaran shares so that he would be entitled to take a deduction for loss on those shares. He was an intelligent man, an experienced lawyer, and a person familiar with the tax laws. He knew that the results which he desired could not be obtained unless Innisfail acquired title and ownership. *Commissioner* v. *Ferree*, 84 Fed. (2d) 124, affirming 32 B. T. A. 725. He never thereafter claimed any ownership in the shares or acted in any way inconsistent with Innisfail's ownership. He segregated the shares and marked them as belonging to Innisfail. He had records made on his own books and upon the books of Innisfail which showed clearly that

Innisfail was the owner of the shares. Those books were inspected by the Commissioner. It is only reasonable to believe that the petitioner intended that Innisfail should own the shares.

The respondent argues that the petitioner completely dominated Innisfail and for that reason the latter is to be disregarded for tax purposes. The petitioner concedes that he dominated Innisfail, but the evidence shows that he never took any improper advantage of his power in any of the transactions involved in this proceeding. No argument is made that any of the transactions of sale between the petitioner and Innisfail were made at prices other than the fair market price of the securities at the time of the sale. The evidence shows that the prices in every instance were fair and proper. No contention is made and there is no evidence that either the petitioner or Innisfail ever used an incorrect basis for gain or loss or an incorrect figure to represent the amount realized from any of the transactions. Innisfail received the full financial benefits and suffered the consequences of ownership of the Chrysler, Hudson, and Aldebaran shares. Although the petitioner freely transferred funds back and forth as was convenient, still there is no indication in the record that he ever used his power to control the corporation in any improper way to his own advantage, to the injury of the corporation, or to the injury of the Government. He admits that one of his purposes in organizing Innisfail was to reduce taxes. Neither the power to control nor the purpose of organization requires that the separateness of an individual and his corporation be disregarded for tax purposes where the corporation is not used improperly. *Gregory* v. *Helvering*, 293 U. S. 465; *Jones* v. *Helvering*, 71 Fed. (2d) 214; certiorari denied, 293 U. S. 583; *Commissioner* v. *Eldridge*, 79 Fed. (2d) 629; *James Lee Johnson*, 37 B .T. A. 155 and cases there cited; affd., 104 Fed. (2d) 140.

The respondent charges at one place in his brief that the directors of Innisfail were dummies, while at another place he charges that those same directors did not authorize the acts of the petitioner on behalf of Innisfail. This inconsistency weakens both arguments, but, what is more important, the facts show that all of the acts of the petitioner on behalf of Innisfail were either authorized beforehand or were ratified afterwards by the directors of the corporation.

The record as a whole does not present clear and convincing evidence of fraud. *Drawoh, Inc.*, 28 B. T. A. 666; *George L. Rickard*, 15 B. T. A. 316; *Harry Feldman*, 34 B. T. A. 517. We hold that the Commissioner erred in determining that a fraud penalty was due under section 293 (b) for 1931, and his later contention of fraud for 1929 and 1930 also fails for lack of proof.

The deficiencies depend upon the same evidence and much of the discussion applies with almost equal force to the general issue of the

deficiencies. It shows that the various transactions were not lacking in bona fides, as the Commissioner determined, or in any other essential. It is not our province to judge the actions of the petitioner except as they may bear upon this tax question. *Bullen* v. *Wisconsin*, 240 U. S. 625. Specific provisions were inserted in the Revenue Act of 1934 (sec. 24 (a) (6)) to prevent tax avoidance by the use of a family corporation. The sales were effective to entitle the petitioner to the deductions which he claims and to relieve him from tax upon the dividends. Cf. *Foster* v. *Commissioner*, 96 Fed. (2d) 130; *James Lee Johnson, supra.*

Reviewed by the Board.

*Decision will be entered under Rule 50.*

---

HARRON, dissenting: I dissent from the conclusions that petitioner is not taxable upon the dividends in question; that bona fide sales of stock were made to the Innisfail Corporation resulting in deductible losses; that none of the deficiency is due to fraud with intent to evade tax. Having heard this case, I am convinced that the evidence supports findings of fact other than many that are made and supports conclusions opposite to those reached. Further, I believe that neither conclusions reached nor dicta of the court expressed in the case of *Smith* v. *Higgins*, 102 Fed. (2d) 456 (C. C. A., 2d Cir.), are controlling here or authority for reaching any particular conclusion in this case. The Circuit Court of Appeals for the Second Circuit reviewed, in the *Smith* v. *Higgins* case, a record appealed from a jury trial involving transactions between the petitioner here and the Innisfail Corporation in a later year, 1932. Each case must stand on its own record. Considerations of this Board in this case must be restricted to the record which has been presented in this case.

Petitioner's claim that he is tax-exempt upon certain dividends in the taxable years is premised directly upon his contention that in 1929 and 1930 his wholly owned corporation, Innisfail, was indebted to him so that in those years the dividends were received in payment on account of the debt; that in 1931 he received the dividends as loans. In that year he claims to have been indebteded to the corporation. Whether or not Innisfail owed amounts to petitioner and loaned amounts to petitioner is the immediate question. There is also the question whether bona fide sales were made in 1929 of the Hudson and Aldebaran stock. The foundation of petitioner's theory, of course, is that Innisfail was a separate entity and that it owned certain stocks, particularly Chrysler and Hudson stocks, and that it is taxable upon dividends, being a separate entity and being able to be both a debtor and a creditor of petitioner. The bona fides is questioned throughout by respondent. It is pleaded by respondent that the petitioner filed false and fraudulent returns in each taxable year

before us because he failed to include in his income dividends received aggregating $200,909, and because a deduction was taken, in 1929, for $88,051 as a loss upon sales to Innisfail, which sales are said to have been not bona fide but part of a tax evasion scheme. The majority opinion is written, as I read it, with emphasis from the start upon analysis of the fraud issue and, concluding that throughout the transactions were bona fide, the matter of liability for income tax, apart from liability for the fraud penalty, is summarily disposed of in petitioner's favor. There are involved questions relating to two types of tax liability and it is necessary in my opinion to consider first whether, apart from considerations of fraud, petitioner's income tax liability is as respondent has determined. Therefore, here, the fraud issue will be considered last. Even with that order of thought, the questions relating to plain income tax liability are affected by the fraud charge because, that charge being present, there is no concession whatever by respondent that transactions involving Innisfail were undertaken in good faith. Respondent contends with vigor that petitioner has pursued, since 1926, a deliberate tax evasion scheme. The pleadings put upon this Board the duty and the burden of scrutinizing closely all of the transactions. Therefore, while the years of 1929, 1930, and 1931 only are before us, we must look back over prior years to comprehend respondent's theory. Likewise petitioner's theory, that at the beginning of 1929 Innisfail was indebted to him in an amount of about $312,000, requires that we examine the conduct pursued in the earlier years. It is inescapable that in this dissent the evidence must be set forth with more particularity than has been done before. Further, having heard this proceeding and having reached conclusions other than those of the majority, I find in the evidence facts which lead me to believe that the Innisfail Corporation never obtained title to the original block of Chrysler common stock.

It is the purpose of this dissent to show that the Innisfail Corporation was not created for any business or corporate purpose and that it has been used solely for purposes of circumventing the plain intent of the pertinent revenue acts; that it was so completely dominated by petitioner in the transactions involved in the taxable years and in the transactions in earlier years which are said to have created a debt of the corporation to petitioner that the transactions were not with a separate entity under the revenue acts; that, even apart from all considerations of the reality of the transactions under the revenue acts, petitioner had no intent to and did not allow the corporation, claimed to have been a separate entity, to acquire good title to various stocks. I maintain, taking an extremely hypothetical case,

that if any stranger had obtained a judgment against Innisfail and attempted to levy execution upon the stocks and their dividends, which are alleged to have been owned by Innisfail, the corporation would have had as a defense that the stocks were at all times owned by Smith, that the dividends at all times were his, and that it was a mere agent of Smith. Such a defense would be based upon the failure of Smith to comply with local law as set forth in the New York Stock Transfer Act in sections 162 (a), (b), 165, 171 of the New York Personal Property Law. It is perfectly plain that petitioner's conduct, his formula of merely writing memos of sale as a means of transferring title to stock certificates and at the same time keeping the stock, never making "delivery" to his corporation in strict compliance with section 162 of the New York Personal Property Law, never giving notice to the outside corporations of any change of ownership of stock, was believed to be adequate *by petitioner* because he dominated the Innisfail Corporation. There was no one to object. But we are asked to recognize such transfers as adequate to free petitioner from *taxation* upon income he received and enjoyed. While we are not bound by requirements of local law in applying the revenue acts, it is extremely doubtful whether, in applying the revenue acts, we should give recognition to transactions undertaken without strict and literal compliance with local law, particularly where the taxpayer admits that an important purpose was to circumvent the Federal revenue acts and where the evidence shows such purpose to be the only one. It makes a stronger case against a taxpayer that he has ignored the literal requirements of local law in transactions held out to have been with a separate business entity. If petitioner's ingenuity fails at any point we should not resolve doubts in his favor. *Morsman* v. *Commissioner*, 90 Fed. (2d) 18. A taxpayer can hardly expect us to regard transactions as complete, so as to exempt him from tax liability under the revenue acts, where he has chosen to leave the transactions incomplete and subject to defenses under local law and executed in a manner in which no real business transaction would be executed. So I would hold that the transactions fail, not only because they were not real under the tax law, but because the transactions would fail if, instead of Innisfail, they had been with, for example, the hypothetical XYZ Co. in which petitioner did not own any stock, albeit the XYZ Co. would not, by any stretch of the imagination, ever carry on such transactions with a stranger in the normal course of business.

The fallacy of the view of the majority is that it says, in effect, that, since Innisfail was wholly owned and dominated by Smith, he did not need to carry on his transactions with it as he would have

done if he had been dealing with a corporation which he did not dominate and control. It seems to be the majority view that Congress intended to allow a person to split his tax personality into two tax entities, one individual and one corporate; or that there are "loopholes" in the revenue act which make such possible and that only special legislation can prevent the result approved. This I can not believe, but believe that the resources of the judicial process, unaided by any special legislation to "spell out" or implement the revenue act as it stood in the taxable years, is adequate and able to block such effort as we have here, to escape just and lawful taxation. I do not find any strain in sustaining respondent. I recognize that bookkeeping and arithmetic may make a transaction look real, but they may be, and here they are, only devices to give the appearance of reality to that which is fiction. A myth is usually logical, but it is nevertheless a myth. A corporation is a legal fiction, but, once the state has given the corporate fiction life, corporate transactions can and must have a corporate and business purpose to gain recognition under the revenue acts. Congress, in recognizing the corporate entity as a "person" for purposes of taxation, surely did not intend that a different standard of reality should be applied to corporations than to individuals. Certainly authorities point to the contrary and the courts have separated the real from the fictitious by viewing transactions in their entirety and by digging substance out of the veins of form. See *United States* v. *Phellis*, 257 U. S. 156; *Helvering* v. *Gordon*, 87 Fed. (2d) 663; *Sanborn* v. *Commissioner*, 88 Fed. (2d) 134; *Macqueen Co.* v. *Commissioner*, 67 Fed. (2d) 857; *Shoenberg* v. *Commissioner*, 77 Fed. (2d) 446; *Helvering* v. *Security Savings & Commercial Bank*, 72 Fed. (2d) 874; *Gregory* v. *Helvering*, 293 U. S. 465; *Commissioner* v. *Griffiths*, 103 Fed. (2d) 110.

Petitioner organized Innisfail to effect one of those "anticipatory arrangements" whereby the anticipated gain to be realized from the exchange of Chrysler preferred for common stock in 1926 was to be shifted to a corporation formed for tax purposes. Innisfail was organized four days prior to the date the exchange was made. Thereafter Innisfail was a dummy in tax transactions. All transactions attributed to it, with a few minor exceptions, were *tax transactions*, for the purpose of avoiding tax. The use of Innisfail for such transactions continued until 1932. It is hardly reasonable to believe that it was a mere coincidence that this use was ended in 1932 coincidentally with investigation by revenue agents of petitioner's receipt of dividends reported in the Innisfail return. It is interesting to note that in 1936 Congress ended the immunity of corporations from tax on dividends and in 1936 petitioner disposed of his interests in Innisfail.

While petitioner now states that a purpose in organizing Innisfail was to set up a corporation to buy and sell securities, the evidence shows that the only securities Innisfail "bought" and "sold", with a few minor exceptions, were securities which petitioner "sold" to Innisfail to obtain tax benefits. Petitioner himself bought and sold stocks in large amounts from 1926 through 1934, his own purchases aggregating $5,757,103, and his own sales aggregating $4,921,331— apart from transactions under consideration. The facts clearly contradict petitioner's claim that Innisfail carried on a business, in the normal sense, of buying and selling securities. Under the Revenue Acts of 1926 and 1928 and until the Act of 1936, corporations were immune from tax upon dividends received from domestic corporations, in whole or in part. (Sec. 234 (a) (6), Act of 1926; sec. 23 (p), Acts of 1928 and 1932; sec. 102 (h), Act of 1935.) Any dividends reported in the return of Innisfail were not taxable. However, if petitioner received any distribution from Innisfail he was taxable thereon. His plan from 1926 through 1931 and shortly after was to receive the dividends which were reported in the Innisfail returns in some way other than as a distribution, i.e., as a payment of a "debt" due him from Innisfail or as a "loan." The mechanism followed was, first, to keep all stocks alleged to belong to Innisfail in his own name so as to receive directly all dividends and eliminate any cash payments from Innisfail to him; second, to build up on account books, balances to show "debts" either from Innisfail to himself or vice versa; third, to "charge" Innisfail on the books with purchases of stock from him to offset credits for the dividends and to "credit" Innisfail for sales of stock to him to build up "debt" from himself; fourth, to make "sales" either way, by writing memos of sales without, however, transferring or delivering certificates of stock with the memos of sale; fifth, to maintain a "running account" between the corporation and himself on his own books in which debits and credits were entered consistently. Thus the "running account" between petitioner and Innisfail provides petitioner with his contention that he received dividends in two of the years as payments on account of debts, and as loans in the third year. The mechanism is extremely simple, and petitioner, owning large quantities of stocks, readily built up "debts" of the corporation to him by charging his corporation for purchases of stocks, and offsetting the resulting debits with credits for dividends. The degree to which he restricted his "running account" device is not material. But the evidence shows that it was manipulated so as to allow little or no net "earnings" to Innisfail. In 1931 the balance in the running account changed to the corporation's favor, but petitioner continued to "borrow" all cash dividends. He reported his income on a cash basis, but he reported no dividends in

1931 and in 1932 he "sold" some more of his own securities to Innisfail to offset the credit balance built up in 1931. Petitioner paid his so-called "debts" to the corporation by creating other "debts" from the corporation to himself. No note or evidence of debt was ever given, no interest charged, and no formal corporate authorization adopted to incur indebtedness to or make loans to petitioner. I do not regard blanket approvals to the end of each year of the "running account" balances as adequate for our purposes. Such blanket ratifications were again part of the mechanism.

*Innisfail was the alter ego of petitioner.*—Petitioner completely dominated Innisfail Corporation, being the sole stockholder, and the only person to "deal" with it, provide it with cash, and withdraw cash. The other directors and officers of Innisfail were mere dummies. They were associates of petitioner, employed by the General Motors Co. Innisfail had no office, no furniture or fixtures, no letterheads, no safe deposit box, no employees. It was organized without any cash. It had a bank account upon which only petitioner made withdrawals. Books were kept for Innisfail by petitioner's own secretary and accountant, who was also an employee of the General Motors Corporation. The balance sheet of Innisfail as of December 31, 1931, lists securities as assets of a total value of $845,228. Out of this total amount the only stocks in the name of Innisfail and purchased out of funds in the Innisfail bank account were a small number of shares of mining stock and some Ecuadorian stock purchased for $8,418. These stocks were issued in the name of the Innisfail Corporation. All other stocks that are listed in the books of Innisfail over the period from 1926 to the end of 1931 were stocks which either originally belonged to petitioner or were purchased by petitioner with his own funds. Petitioner received all dividends, including dividends on stocks allegedly sold to Innisfail from time to time.

The following description of the major transactions will serve to illustrate how petitioner attributed his own transactions to the corporation:

(a) The first transaction relating to the exchange of Chrysler stock in 1926 needs some further amplification. Prior to June 14, 1926, there were issued to petitioner in his name certificates for 40,314 shares of Chrysler common stock, including the 26,477 shares which Innisfail is said to have acquired. After June 14 and after the option agreement with Bassett ended, petitioner made no delivery of the 26,477 shares of common stock to Innisfail; the Chrysler corporation was not notified of any change of ownership; the stock certificates were not endorsed in blank or endorsed to Innisfail. The certificates were not in any manner appropriated to any bill of sale to Innisfail. The certificates at all times remained in Smith's safe deposit box

and he received all dividends directly and deposited them in his own bank account.

(b) In December 1927 petitioner deposited in Innisfail's bank account $15,000; the next day a check on the account was drawn for $12,375 payable to the Mardon Corporation in a purchase of menthol crystals. J. C. Kennedy of the Mardon Corporation was a friend of Smith. In 1928 petitioner received from the Mardon Corporation $14,916, which he deposited in his own account. In this transaction, Innisfail was used by petitioner in a transaction clearly his own. No corporate authorization appears. The transaction was reported on Innisfail's income tax return.

(c) In 1927 Smith deposited $5,000 in Innisfail's bank account. Shortly after a check was drawn on the account for $5,000 to A. H. Carlisle, a friend of petitioner. This was a loan to Carlisle, which he did not repay to Innisfail. In 1928 Carlisle gave Smith 500 shares of Bondshares Fiscal Corporation stock, the certificates being in Smith's name. In the "running account" with Innisfail, it was charged with the $5,000 put in its bank account. When Smith received dividends on the Bondshares stock he credited the amounts on books to Innisfail.

(d) In 1927 Innisfail had no cash to pay Federal income tax reported by it for 1926 in the amount of $69,679.17 on the gain from the exchange of Chrysler stock. Petitioner before the due dates for quarterly income tax payments deposited cash in the Innisfail bank account, on which checks were drawn to pay Federal taxes. On the books, Innisfail was charged for the amounts advanced.

(e) In 1927 petitioner executed two memoranda of sale stating that he sold to Innisfail 500 shares of Gillette Safety Razor stock for $49,750 and 1,700 shares of Gimbel Bros. stock for $68,000. The certificates remained in Smith's name and possession and he continued to receive the dividends. He charged Innisfail on the books for the alleged purchase price and credited Innisfail for dividends received thereafter. Petitioner took deductions in his returns for the "sales" of these stocks. Subsequently these stocks were sold to outsiders. The proceeds of the sales were temporarily deposited in the Innisfail bank account and brought the amount of cash in the account up to around $100,000. In 1928, $100,000 was put out on call loans and interest thereon was deposited in the Innisfail bank account, and $3,903 remained in the Innisfail bank at the end of 1928. On December 26, 1928, a cash dividend was "declared" on Innisfail stock, which amounted to $70,000. Innisfail had no cash with which to pay the dividend. Instead there was a charge on the books against Innisfail for $70,000 creating a "debt." Petitioner filed his income tax returns on a cash basis and reported this dividend in his own re-

turn in 1928. In July 1929 the call loans were paid back temporarily into the Innisfail bank account. Thereafter Smith drew from the Innisfail bank account $105,000 and transferred the amount into his own bank account. Tracing these transactions back, it appears that Smith received the entire proceeds of the sales of the Gillette and Gimbel stocks in spite of his purported sale thereof to Innisfail.

(f) In July 1928 Smith purchased with his own funds new Chrysler common stock, 4,412 shares, for $253,690. The certificates were issued in his own name and he received the dividends. There was no corporate authorization for such purchase for or by Innisfail, but on the books Smith charged Innisfail for the purchase price, creating a "debt" to him. This debit in 1928 on the books accounts chiefly for the so-called debt of Innisfail to petitioner at the beginning of 1929. In reality it was no more than a book item. In December 1929 Smith sold the stock for $145,596 and deposited the proceeds in his own bank account and credited Innisfail on the books. Prior to the sale by Smith, a memo of sale was written stating that Innisfail sold to Smith 4,412 shares of Chrysler common stock for $145,596. The memo of sale should be recognized as merely a device in an entire plan. The transaction was clearly a Smith transaction and not one of a separate corporate entity. The income tax return filed for Innisfail in 1929 reported the loss on the sale of the stock.

(g) In December 1929 R. G. Tracy was elected a vice president of Innisfail. He was a retired physician and a friend of Smith, and was very sick and in need of financial aid. Out of the Innisfail bank account Tracy was paid $2,200 in 1929 and $3,600 in 1930 and 1931, as "salary." These payments were nothing other than gifts to Tracy from Smith, paid out of the Innisfail bank account. In the income tax returns of Innisfail for these years deductions were taken for "salaries" in the above amounts.

(h) In September 1930 a memo of sale was executed, stating that Innisfail sold to Smith 10,000 shares of Chrysler common stock for $195,000. The certificates referred to in the memo were already in Smith's name and possession and were part of the original 26,477 shares. There was no corporate authorization for the "sale." On the books Smith credited Innisfail with $195,000. After the memo was executed Smith reported in his own income tax returns dividends on the 10,000 shares of Chrysler common. This transaction was another step in the manipulation of the "running account" on the books between Smith and Innisfail.

With the exception of several deposits of cash by Smith in the Innisfail bank account to enable the payment of taxes reported due from Innisfail and a few minor purchases of mining and Ecuadorian stocks with funds from the Innisfail bank account, the trans-

actions described above represent substantially all of the "business life" of Innisfail from 1926 through 1931. It is apparent that Innisfail was not carrying on an independent business of its own. I think it is clear beyond any doubt that Innisfail was created and used solely for tax purposes by petitioner and that it was his "corporate" pocket. The major transactions imputed to Innisfail involved alleged purchases of stocks from petitioner to enable him to obtain reductions in his own income taxes. In all of such transactions, Innisfail was so completely the creature of petitioner that it was his *alter ego* and the transactions imputed to it were no more than petitioner's transactions with himself. The transactions, memos of sale written to give a semblance of reality to the planned "sales"—book entries creating "debts"—should receive no recognition whatever in this tax proceeding. As stated in *Gregory* v. *Helvering, supra,* "The rule which excludes from consideration the motive of tax avoidance is not pertinent to the situation because the transaction upon its face lies outside the plain intent of the statute." The definition of gross income in the statute (sec. 22, 1928 Act) is to be broadly construed and "taxation is not so much concerned with refinements of title as it is with actual command over the property taxed—the actual benefit for which the tax is paid." *Corliss* v. *Bowers,* 281 U. S. 376. So a transaction which is designed to shift taxation on income to a corporation but which leaves the command, use, and enjoyment of the income in the individual, just where it was before, is a transaction outside of the plain intent of the statute to tax an individual upon his entire income. And a paper transaction where a seller has after a sale all that he had before does not prove a loss upon which a tax deduction can be taken. *Helvering* v. *Security Savings & Commercial Bank, supra.*

*The Hudson and Aldebaran stocks transactions in 1929.*—To supplement facts set forth in the findings of fact, the record shows the following. In December 1929 petitioner owned 2,000 shares of Hudson Motors stocks represented by certificates in his own name. The memo of sale which petitioner executed in 1929, purporting to effect a sale of 1,900 shares of Hudson stock, did not identify any certificates and petitioner did not appropriate any to the memo of sale by attaching to it any certificates or by endorsing any of the certificates he held. No notice of any change of ownership of any of the Hudson stock was given to the Hudson Motors Co. and no order was issued to pay dividends to Innisfail or to its account. The minutes of the Innisfail Corporation are silent on the transaction and do not contain any authorization to purchase Hudson stock. Petitioner retained the same full custody of, control over, and benefits from the stock after executing the memo of sale as before. The certificates

remained in petitioner's safe deposit box. Petitioner continued to receive dividends. Petitioner did not hold the stock under any written or authorized appointment as a nominee or agent and his powers over the stock were not altered or diminished. The transaction was at the most a book transaction. Innisfail did not have cash to pay in consideration of the purchase attributed to it. There was, at the time, about $9,650 in the Innisfail bank account. On the books, Innisfail already "owed" petitioner a substantial amount, so that there was no consideration in 1929 by way of any cancellation or reduction of any standing "debt" of petitioner to the corporation. In 1932, 1,900 shares of Hudson Motors stock were sold to outside interests at a loss for about $12,300. The proceeds were temporarily deposited in the Innisfail bank account. In 1932, $10,000 was transferred from the Innisfail bank account to petitioner's bank account, and in 1933, $105,000 cash was transferred to petitioner's bank account. It appears that petitioner received back in his own bank account cash proceeds from the sale to outsiders of the Hudson stock. The only purpose in the Hudson stock transaction in 1929 was to enable petitioner to take a loss deduction on his own return. As for the Aldebaran stock, it was stock in a closely held corporation. Innisfail gave no consideration for the alleged purchase in 1929, either in cash or in cancellation of any "debt" of petitioner to the corporation. On the books, the "debt" of Innisfail to petitioner was increased by $160,800. The only purpose in the Aldebaran stock transaction in 1929 was to enable petitioner to take a loss deduction on his own return. There was no corporate authorization for the alleged purchase of the Aldebaran stock by Innisfail, the minutes of the corporation being silent on the transaction.

*The bona fides of the transactions.*—The issues do not involve questions of the *right* of petitioner to make sales of stocks to his wholly owned corporation, or to borrow from or loan to a wholly owned corporation. The question is, in the main, whether petitioner has properly manifested an intention to make real sales of stock at various times, to make real transfers of title at various times to his corporation, to establish a real debtor and creditor relationship. Starting with the taxable year 1929, the instance of a purported sale of Hudson stock to Innisfail by means of a memo of sale only, without delivery or transfer of the stock, without any order to pay thereafter dividends to Innisfail, but with continuous receipt and retention of dividends after the writing of the memo of sale, we find in that transaction, giving rise to a direct issue before us, a repetition of a procedure followed by petitioner in several instances beginning in 1926 with the organization of Innisfail. Petitioner's reliance upon a book balance at the beginning of 1929 as representing

a "debt" to him which petitioner alleges was being paid off in the taxable years through his receipt of dividends on stocks purportedly owned by Innisfail has required review of a series of transactions beginning in 1926. Repetition of a formula in the various transactions and the interrelation of the transactions in the taxable years with the previous transactions force me to conclude that the transactions directly in question in the taxable years were component parts of a tax evasion scheme in which the very repetition of the devices used deprives the particular and all the transactions of reality. The succession of the transactions and the repeated use of the same devices lead me to conclude that various alleged sales of stocks to the Innisfail Corporation were never intended to be bona fide sales but were, in each instance, a mechanism to serve petitioner with a means of avoiding taxation upon dividends and taking deductions for losses without ever really parting with the property giving rise to the income or to the claimed losses. Cf. *Guaranty Trust Co.* v. *Commissioner*, 98 Fed. (2d) 62. That petitioner had any bona fide intent can not be dependent upon his execution of memos of sale or the debiting and crediting of amounts in a running book account. The form of the transactions is not determinative—the substance of the transactions is. The majority opinion states that "if he [petitioner] did not intend to transfer the securities to Innisfail, it is difficult to understand his actions." With a record replete with evidence showing that petitioner had no intent of transferring ownership of securities to Innisfail and with actions clearly undertaken in pursuit of a carefully devised scheme, it is easy to understand petitioner's actions and from them it should be concluded that none of the transactions relied upon were bona fide. Such conclusion seems justified by the following considerations.

Petitioner has testified that "stocks pass by delivery and endorsement." That is a correct statement of local law. See sec. 162, Personal Property Law of New York; *Wills* v. *Investors Bankstocks Corporation*, 257 N. Y. 451; 178 N. E. 755; *Agar* v. *Orda*, 258 N. Y. S. 274; affd., 264 N. Y. S. 939; affd., 190 N. E. 479; *Coyne* v. *Chatham Phenix National Bank & Trust Co.*, 281 N. Y. S. 271. Petitioner is a lawyer and is presumed to know legal requirements and the way of carrying out ordinary business transactions. In every instance from 1926 through 1931 where petitioner claims to have conveyed title to Innisfail to dividend paying stocks, petitioner never endorsed and delivered the stocks to Innisfail, viz., transactions in Chrysler common stocks, Gillette, Gimbel Bros., Bondshares, and Hudson Motors stocks. In no instance where dividend paying stocks were involved was there any appropriation of the certificates of stock to separate memos of sale. At no time, until investigations by the Government brought it

about, were orders issued to pay dividends upon stocks to Innisfail or to its account and at no time did petitioner endorse dividend checks payable to him over to Innisfail. There were no agreements as to any future deliveries of stocks; no written authorizations, such as are customary, naming petitioner as a nominee or agent of Innisfail. And so upon the simple facts there is no showing of an intent, real and bona fide, to transfer complete ownership of stocks to the Innisfail Corporation. Ownership of stocks implies a right to have full control over and receipt of all income derived—all dividends. Petitioner, judged by what he did, had no bona fide intent that Innisfail should receive any cash dividends on stock alleged to be owned by it. His intent was to carry on a series of bookkeeping transactions. We have this astonishing testimony in reply to a question of why stock was not transferred of record to Innisfail, which gives an appearance of innocence and ignorance which I can not even impute to petitioner:

Because *this situation of the real ownership of the stock was of no particular importance as far as I was concerned* and when we got into these tax situations with the Government, the question of the receipt of the stock or the dividends or the question of whose name something stood in at the time, appeared to have importance that it did not have in my mind as a lawyer. [Emphasis supplied.]

At another point petitioner, in answer to a question relating to what assets Innisfail had, which petitioner could not answer without referring to the "running account" record, testified that "It is all bookkeeping transactions." Elsewhere petitioner admits that he was conscious of tax consequences in every transaction and that Innisfail was formed to effect a reduction in taxes which petitioner would otherwise be liable to pay. So it is inconsistent for petitioner to claim in one breath that he had a bona fide intent to convey title to stocks to Innisfail and, in another, to say that real ownership of the stocks had no importance in his mind as a lawyer; to contend that effective transfers of title were completely made, under the facts and circumstances surrounding his continued retention of stocks and of the incidents and benefits of ownership, and still to recognize that stocks pass by endorsement and delivery.

The only explanation petitioner gives now for his retention of certificates of stock after executing memos of sale relied upon as effecting complete transfers of title, is that it would be more difficult to transfer stocks out of the name of a corporation than it is to transfer stocks out of the name of an individual, the implication being that retention of certificates in his own name was merely a convenience; and yet petitioner knew that there would be no active trading in the stocks involved and that there were few blocks of

stocks involved, and he had all the facilities in his large office for meeting customary requirements of transfer agents, if and when, Innisfail in any bona fide transaction had need to transfer stocks out of the corporate name. His explanation is weak and without merit; it does not remove the large doubt cast upon petitioner's good faith by his retention of securities in his own name in transactions having no purpose other than tax evasion or tax avoidance. And, even granting that stock is largely held, in *normal business conduct*, in the name of a nominee for greater convenience in transferring stocks upon sales or other disposition, that business custom provides no explanation for petitioner's continued receipt of dividends and deposit thereof in his own bank account, for normally a mere nominee is only an agent and he remits to his principal all gains and income paid to him as an owner of record. Petitioner never did this in any real sense, as is evidenced from the fact that from 1926 to 1932 petitioner received and deposited in his own account cash dividends on stocks in his name reputed to belong to Innisfail, aggregating $404,045.50, and, while he claims to have "borrowed" from Innisfail all such dividends, he never "repaid" them in cash, disregarding at this juncture petitioner's payment of a small amount of taxes reported due by Innisfail, as of minor consequence.

Neither can I conclude that petitioner under his theory ever repaid any amounts of dividends, alleged to have been borrowed, by transferring to Innisfail title to other property, such as title to other stocks. Up to the beginning of 1929 such transactions as are recorded in the running account as "debits" to Innisfail to offset "credits" made for cash dividends received by Smith or to be made for dividends to be received by Smith, relate only to debits for the purported sales of 500 shares of Gillette stock and 1,700 shares of Gimbel Bros. stocks and petitioner's own subscription for 4,412 new shares of Chrysler common stock. But, as for the first two stocks, Innisfail obtained no rights of ownership such as acquisition of title in an arm's length transaction would yield, because petitioner retained the stocks, received dividends at all times, and eventually received into his own bank account proceeds of later sales to outside parties. As for the new Chrysler stock, the same facts are present. In that transaction there was no corporate authorization for purchase of 4,412 shares of new Chrysler stock. Innisfail never agreed or bound itself to purchase this new stock from anyone and certainly in 1928 when the transaction was imputed to Innisfail it was in no position to buy new stock for $253,690. Cf. *Stiver* v. *Commissioner*, 90 Fed. (2d) 505, 508. The transaction was another link in the scheme of petitioner to cover up his continued receipt of dividends as payment of "debts" of Innisfail to him. There is no evidence except book entries and

a memo of sale executed in 1929 on approximately if not the same day petitioner sold the stock. The memo of sale was a sham. The bookkeeping entries are not proof of a purchase, or of a debt, or of where title stood. *Sitterding* v. *Commissioner*, 80 Fed. (2d) 939.

Returning to the original 1926 transaction—and that is the keystone in the arch of the "running account" on the books and the whole series of manipulations—I am wholly unable to conclude, as does the majority, that in 1926 "The Chrysler common stock was not acquired from petitioner but was acquired by exercising the option and exchanging the preferred for the common"; or to conclude that "Innisfail then exercised the option and exchanged the 5,005 shares of preferred for 26,477 shares of Chrysler common stock." Space does not permit setting forth the steps that were taken in the Bassett–Smith option agreement and the Maxwell Motors reorganization (the findings of fact made fail to give all the steps, but they are revealed in the record). However, it is a fact that the 5,005 shares of Chrysler preferred stock had already been exchanged for the 26,477 shares of common stock prior to June 14, 1926; Smith had the certificates for the common stock and all that remained to be done was to give Bassett formal notice that he could retain the preferred stock and for him to formally release the common stock. The letter dated June 14, 1926, from Innisfail to Bassett, who incidentally was not in any respect connected with the Chrysler Corporation, was a matter of form and part of petitioner's "anticipatory arrangement" to escape tax upon gain from the exchange. In substance, Innisfail was merely Smith's agent in giving that notice to Bassett. Further, Smith was the only person from whom Innisfail could acquire the certificates for the 26,477 shares of Chrysler common stock and Smith did not deliver or transfer the stock to Innisfail at any time. Smith's offer to transfer Chrysler stock to Innisfail dated June 14, 1926, was not completed by performance at any time from that date through 1931 and stood only as an agreement to make a conveyance which remained in an executory state for the entire period under consideration. Under such facts it is not material that 97 shares of Innisfail stock were issued in 1926 to petitioner "in exchange" for the Chrysler stock in this proceeding. There is sufficient evidence to provide a presumption that there was no consideration for their issuance.

The bookkeeping entries making up the "running account" with Innisfail are not the entire bookkeeping record of Innisfail. It is correct that books were kept for the corporation and audited periodically. There are a few transactions reflected on the Innisfail books that have no relation to any of the transactions involved here or to any of the transactions making up the "running account", but such transactions are minor and few and do not enter into our con-

siderations. Petitioner kept on his own books the "running account" with Innisfail in which all the tax transactions were entered. It is not of any consequence that care was exercised in keeping bookkeeping records properly, i. e., that for the Smith book account corresponding Innisfail book accounts were kept. Nevertheless, the "running account" kept was the chief device in the entire arrangement. This is apparent from petitioner's testimony at one point that he did not want Innisfail to pay him any money. That testimony upon analysis means that, although Innisfail was supposed to own large amounts of dividends and although petitioner, instead of Innisfail, was receiving the dividends, the "running account" was kept to give the appearance that Innisfail was receiving all benefits of them, i. e., it was credited with dividends Smith received and debits were made to offset credits to take care of the absence of any transfer of cash from petitioner to Innisfail. But, as has been shown before, just as Innisfail at no time received the dividends for which it was given book credits, so it never received in any real sense stocks for which it was "debited." (See above discussion relating to alleged acquisition by Innisfail of Gillette, Gimbel, Bondshares, original Chrysler stock, new Chrysler stock, and Hudson stocks.) Any other debits on the account for cash advanced to pay taxes and auditing expense were only parts of the entire plan to have Innisfail file tax returns. Hence, the "running account" book entries should be regarded as sham and device where the record shows that transactions entered therein were not transactions of any substance. So regarded, balances in the account are not proof of the making of loans or the existence of debts one way or the other. Aside from making the bookkeeping entries, nothing was done to evidence a debtor-creditor relation.

The term "running account" is apt. It had a mobile character. It was clearly petitioner's intent that all credits and credit balances in Innisfail's favor would be offset by "debits" to bring about a balance. But that was the mechanism of the plan devised to carry out petitioner's express desire that Innisfail should not outwardly pay him any money. Stripped to the essence, petitioner, having created for tax purposes in 1926, a corporation, to report a gain of a half million dollars on an exchange of stock, thereafter devised his "running account" device to circumvent, to the highest degree commensurate with any appearance of reality, the collection of revenues to become due because of the existence of the corporation. The device had several blades and it can be better understood by keeping in mind the provisions of the revenue act applicable to such corporations (see sec. 220 (a), Act of 1926; sec. 104, Act of 1928) and the sections defining dividends (see sec. 201 (a), Act of 1926, and sec.

115, Act of 1928). "Mere bookkeeping entries can not preclude the Government from collecting its revenues." *Sitterding* v. *Commissioner, supra.* See also *Alpha Portland Cement Co.* v. *United States,* 261 Fed. 339; *Gulf Oil Corporation* v. *Lewellyn,* 248 U. S. 71. The majority view expressed in the following comment, that the books [running account] "were accorded complete respect by both parties and were just as effective for all practical purposes as any accounts between separate entities doing business with each other would be", fails to recognize that a true situation can not be altered by bookkeeping transactions, *Helvering* v. *Gordon, supra,* and fails to go to the essential question whether the bookkeeping entries as such and under the circumstances are effective to sustain petitioner's claim that he is not taxable on income. In my opinion the "debts" which petitioner contends existed by virtue of what appears in the running account should be held to be manipulated debts—mere book debts—insufficient to prevent taxation of petitioner on dividends he received in the taxable years. No other conclusion is possible in the face of petitioner's testimony that "it is all bookkeeping transactions."

As for the weight to be given the evidence that Innisfail income tax returns reported the dividends in question, it is of course elementary that the reporting of income by one taxpayer upon its returns is not proof that it, rather than another taxpayer, is taxable on the income reported. *Burnet* v. *Leininger,* 285 U. S. 136; *Lucas* v. *Earl,* 281 U. S. 111. Nor is there any estoppel against the Government's taxing petitioner upon income reported in Innisfail returns because it has accepted the Innisfail returns. A similar argument was made by the taxpayer in *Guaranty Trust Co.* v. *Commissioner, supra.* There the court stated: "There could be no estoppel * * * even if one were possible against the Government because it had accepted payment of taxes that were theoretically inconsistent with a liability for others." Here there is no reason for assuming that Government officials knew the circumstances of the alleged sales of stocks to Innisfail.

*There were no transfers of 26,477 shares and 4,412 shares of Chrysler stock or of 1,900 shares of Hudson stock adequate to relieve petitioner from taxation upon the dividends paid to him on the stocks.*—Respondent has included in petitioner's taxable income in the taxable years income on all Chrysler stocks and on Hudson stocks. Petitioner received the income under circumstances which show that it was subject to his unfettered command and freedom of enjoyment. The evidence shows that all transactions relied upon by petitioner as evidenced by his written memos of sales and entries in his "running account" were devices and anticipatory arrangements to divert taxation from himself upon substantial income re-

ceived. Upon the principles set forth in *Lucas* v. *Earl, supra; Corliss* v. *Bowers*, 281 U. S. 376; *Burnet* ;v. *Leininger, supra; Groves* v. *Commissioner*, 99 Fed. (2d) 179, petitioner should be held taxable upon all the dividends in question. The transactions relied upon, the alleged acquisitions of the three blocks of stock by Innisfail, should be held to have been incomplete and not to have resulted in any transfer of the stocks in question to another so as to relieve petitioner from taxation upon the dividends paid on the stocks, under the principles approved in *Marshall* v. *Commissioner*, 57 Fed. (2d) 633; certiorari denied, 287 U. S. 621; *Schoenberg* v. *Commissioner, supra; Commissioner* v. *Griffiths, supra; Belle G. Loewenberg*, 39 B. T. A. 844; *William C. Rands*, 34 B. T. A. 1107; *Morsman* v. *Commissioner*, 90 Fed. (2d) 18; *Nicholson* v. *Commissioner*, 90 Fed. (2d) 978; *Wishon-Watson Co.* v. *Commissioner*, 66 Fed. (2d) 52; *DuPont* v. *Commissioner*, 289 U. S. 685; *Harold F. Seymour*, 27 B. T. A. 403; *Robert Wilson Carter*, 36 B. T. A. 598; *Commissioner* v. *Dyer*, 74 Fed. (2d) 685. It should be found as a fact that there was no indebtedness of Innisfail to petitioner in 1929 or 1930; that petitioner did not intend to convey the stocks in question to Innisfail; that he did not intend to covey to it the right to receive dividends on the stocks; that he did not convey title to the stocks to Innisfail and did not relinquish dominion and control over the stocks or the dividends; and that the memos of sale were sham and subterfuge, resorted to for the purpose of enabling petitioner to escape income taxes, without the incidents of finality which attend conveyances of ownership of property. It should be held that mere memos of sale do not operate to effect such delivery of stock as to convey title to the stock in the absence of some other delivery of stock certificates, for tax purposes, so as to relieve the person purporting to make a conveyance from tax upon income produced by the property. It is clear that petitioner contends in effect that the memos of sales operated to make a symbolic delivery of stocks, but such symbolic delivery should be held to be insufficient for tax purposes. See Williston, Sales, 2d Ed., par. 274, note 14. Cf. *Marshall* ;v. *Commissioner, supra*, on tax liability for dividends on stocks transferred on the books of the corporation. See, also, *Macqueen Co.* v. *Commissioner, supra; Hellebush* v. *Commissioner*, 65 Fed. (2d) 902; *Atkins* v. *Commissioner*, 76 Fed. (2d) 387.

While we are not bound by local law in applying the revenue acts, I can see no reason for a holding that in applying the revenue acts there need be less done than local law requires. Thus, while the majority opinion broadly states that "Delivery is not always necessary in the case of sales of stock", I am of the opinion that this is true only where the evidence shows agreement to make delivery or such clear intent to make delivery that title may pass prior to

delivery. *Hoffman* v. *Commissioner*, 71 Fed. (2d) 929, and *Ruml* v. *Commissioner*, 83 Fed. (2d) 257, are distinguishable from this proceeding upon facts which showed, in the first case, endorsement of stock certificates and delivery to an attorney for future delivery to the assignee, and, in the latter case, a firm obligation to make a delivery of specific stocks. Petitioner claims to have conveyed title to *certificates of stocks* to Innisfail, but the evidence shows that petitioner disregarded the plain requirements of New York statutes to appropriate to his memos of sale the certificates of stock in question. See sec. 162, Personal Property Law of New York; Commissioner's note. to section 4 of the Uniform Stock Transfer Act, 6 Uniform Laws Annotated; *Hudson Trust Co.* v. *American Linseed Co.*, 180 N. Y. S. 17; *Miller* v. *Silverman*, 224 N. Y. S. 609. By statute the law of New York does not recognize as adequate a symbolical delivery of certificates of stock by a separate document of title. The facts here show that the several memos of sale executed by petitioner in connection with the Chrysler stocks, Hudson stocks, and other stocks, did not in themselves, give to Innisfail control over the possession of the stocks. It has been pointed out that there is danger in ex :ending the doctrine of delivery to symbolical delivery of goods by celivery of a document. Thus, Williston states:

Transfer of goods by delivery of a document is another matter. * * * it might be argued that the delivery of any document of title is a symbolical delivery of the goods; but it is obvious that unless the document in fact controls the possession of the goods, one person may be the actual possessor of the goods, while an adverse claimant holds the symbol. This possibility should not be tolerated. [1 Williston on Sales, 2d Ed., par. 274, note 14.]

The situations presented in this case illustrate well the type of situation which I believe should not be tolerated in transactions relied upon to provide a means to escape taxation. I do not believe that section 162 of the New York Personal Property Law allows such situations. Petitioner was the possessor of the stocks, and the memos of sale, mere symbols, gave Innisfail no substantial rights whatever. See *Wills* v. *Investors Bankstocks Corporation, supra*. It has been said that the kind of transfer of title contemplated by section 162 of the New York Personal Property Law is a transfer involving some physical act, something more than a *theoretical* change of title *or a vesting of title merely by the election of the vendor to consider* title as in the vendee. *Phelps-Stokes Estate* v. *Nixon*, 118 N. E. 241, 243. Certainly the facts show that, in the instances of the Chrysler, Hudson, and other stocks, petitioner's method of allegedly transferring title to those stocks was to make a mere election on his part, supplemented by his running account bookkeeping entries, to consider title in Innisfail in a theoretical way while he continued to enjoy all benefits of ownership, most particularly, the receipt of

dividends. Petitioner clearly failed to take the required steps to convey completely title to the particular stocks to Innisfail. See *In re Banker's Capital Corporation*, 51 Fed. (2d) 737. Petitioner's retention of the particular stocks in his name, custody, and control and his continued receipt of dividends over a period of five years, in one instance, after the execution of the memos of sale, would certainly create at law a presumption of continuance of ownership of the stock. See *Richards* v. *Wells Fargo Express Co.*, 156 App. Div. 268; 141 N. Y. S. 306; affd., 109 N. E. 482; *Allen-West Commission Co.* v. *Grumbles*, 129 Fed. 287, a case closely in point on the facts. In this proceeding, involving an admitted plan to evade or avoid Federal income tax, I see less reason for not applying such presumption here, under the facts, than concluding, as the majority does, that petitioner was not presumptively the owner of stocks upon which he received and kept dividends. In any event, it is a rule that in applying the revenue acts we do not look to refinements of title, but to the actual command over the property taxed. *Reinecke* v. *Smith*, 289 U. S. 172; *Burnet* v. *Wells*, 289 U. S. 670; *Stoddard* v. *Eaton*, 22 Fed. (2d) 184. "A revenue act does not address itself to fictions." See, also, *Davidson* v. *Commissioner*, 305 U. S. 44. "One who retains for himself so many of the attributes of ownership is not the victim of despotic power when, for the purpose of taxation, he is treated as the owner altogether." *DuPont* v. *Commissioner*, *supra*.

*Losses claimed on alleged sales of Hudson and Aldebaran stocks.*— In the instance of the Aldebaran stock, there was no consideration given by Innisfail. Petitioner claims that in 1929 a sale was made for consideration to be paid in a subsequent year. Under the circumstances payment could be made by Innisfail either by way of the dividends petitioner was receiving on various stocks or by a transfer of stock from Innisfail to petitioner. Believing that no such consideration ever passed, Innisfail not owning any dividends or the 10,000 shares of Chrysler stock alleged to have been "sold" by Innisfail to petitioner in 1930, the only conclusion which I believe proper is that the transfer of the Aldebaran stock to Innisfail in 1929 was a gift and not a sale. The "debits" and "credits" relied upon by petitioner as proof that consideration moved from Innisfail to him in this transaction by means of debits and credits upon the books have been discussed above and it is my opinion that they are of no substance and do not provide a basis for petitioner's claim that he sold the Aldebaran stock to Innisfail. Upon a holding that there was a gift, it would follow that petitioner is not entitled to a deduction for a loss under section 23 (e) of the Revenue Act of 1928.

In the instance of the Hudson stock, no loss was sustained by petitioner.

The place of a sale in claiming a deduction is as evidence that a loss has been realized. If the sale is real and is in an isolated transaction, it is conclusive proof. If it is only part of an entire plan, then the entire plan is examined to ascertain whether its effect is to produce a loss or a realized loss. It is immaterial that the motive prompting the sale or the plan of which the sale was a part was to secure a deduction. The matter of interest is whether an actual loss has been realized. Tax laws deal with realities. [cases cited] and look at the entire transaction [cases cited]. (*Shoenberg* v. *Commissioner*, *supra*.)

The facts show that petitioner retained the same benefits of ownership and the same control over the Hudson stock after the execution of the memo of sale written to accomplish the alleged sale in 1929. What has been said immediately above regarding passing of consideration from Innisfail to petitioner applies here. Further, it appears that, when the Hudson stock was ultimately sold to outsiders in a later year, petitioner received the proceeds of the sale by a transfer of cash from the Innisfail bank account to his own bank account. Also, what has been said above regarding presumption of continued ownership after an alleged sale where stock certificates are retained and dividends continuously received, applies equally to the Hudson stock transaction. The transaction upon which petitioner relies should be held to be ineffective to produce a deductible loss. Respondent should be sustained. *Shoenberg* v. *Commissioner*, *supra*; *Gregory* v. *Helvering*, *supra*; *Commissioner* v. *Griffiths*, *supra*; *Nicholson* v. *Commissioner*, *supra*; *Chisholm* v. *Commissioner*, 79 Fed. (2d) 14, 16; *Albert W. Finlay*, 17 B. T. A. 828; *M. I. Stewart & Co.*, 2 B. T. A. 737.

The object of the revenue acts (sec. 22, Act of 1928) is to tax individuals upon gross income from whatever source derived, and the transactions which petitioner claims exempt him from taxation upon income he received in the taxable years upon their face lie outside the plain intent of the statute. *Gregory* v. *Helvering*, *supra*. Likewise, the transactions relied upon for deductions for losses claimed in 1929 lie outside the plain intent of section 23 (e) of the pertinent statute.

*The fraud issue.*—The additional tax prescribed under section 293 (b) of the 1928 Act, and in other acts, is a tax which Congress has imposed, presumably, under the theory that a taxpayer who, willfully, does not report all his taxable income to the Government must pay a penalty. Respondent has claimed the fraud penalty for each taxable year because of petitioner's failure to report in his returns income he received each year from dividends on stocks over which he exercised full control and for taking deductions for losses upon sales that were not bona fide sales. In my opinion respondent has sustained the burden of proof upon him in this issue, having introduced the most revealing evidence, namely, the accounts kept by petitioner on his books pursuant to his tax evasion plan. In my opinion the evidence shows that there

was a deliberate tax evasion scheme. I can see no relief from the charge of fraud in the fact that petitioner kept records. The keeping of records was consistent with and part of a plan to build up a structure for tax evasion purposes. We have stated before that fraud is determined by considering the whole course of conduct involved. *Charles E. Mitchell*, 32 B. T. A. 1093. I am not convinced that petitioner did not intend to deceive by the use of his frequent memos of sales and the bookkeeping entries making up the "running account" with Innisfail. Only by going to petitioner's safe deposit box and examining the various stock certificates, listed as assets of Innisfail in its books, a procedure tantamount to making a title search; only by going to bank account records to learn whether large amounts of dividends ever passed to Innisfail; only by tracing transactions through to their ultimate disposition, could any person comprehend the devices petitioner used. In this proceeding, respondent has traced back all the transactions involved by offering in evidence the "running account" with Innisfail kept in detail in petitioner's own account books, and upon this evidence I would hold that petitioner's Federal income tax returns for 1929, 1930, and 1931 were false and fraudulent with intent to evade tax. See *William E. Mitchell*, 40 B. T. A. 424, promulgated this day.

Petitioner is a competent lawyer, who is engaged in a practice which deals with transactions of corporations in the normal conduct of corporate business and fully understands the provisions of the Federal revenue acts. Petitioner, by his own testimony, knew that title to stocks passes by delivery and endorsement of certificates. Petitioner, by his own testimony, created a corporation for tax reduction purposes, and still intended and *desired* that it should never make any cash distributions to him of large amounts of earnings. Petitioner so arranged matters deliberately to create the appearance of a non-receipt of income which actually he received and intended to receive. It is inconceivable to me that petitioner believed honestly that the Innisfail Corporation was ever the owner of income he received continuously and sought to cover up by a series of sham transactions. Petitioner has not denied that he was responsible for and fully acquainted with all that was represented. As stated in *United States* v. *Murdock*, 290 U. S. 389:

Willfully, when used in a criminal statute, generally means an act done with a bad purpose; without justifiable excuse. The word is also employed to characterize a thing done without ground for believing it is lawful or conduct marked by a careless disregard whether or not one has the right so to act.

While a corporation is a taxable person and while an individual may carry on business transactions with a wholly owned corporation, dealing with it at arm's length, with the motive of reducing tax lia-

bility, *such is far different from setting up a corporation to provide merely another bank account and a foil for sham transactions.* Believing that the record shows convincingly in this proceeding that the latter description accurately describes petitioner's course of conduct from 1926 through the taxable years, I conclude that petitioner had no ground for believing that such transactions were permissible under the revenue acts, and that he willfully defrauded the Government. While we do not have before us the Innisfail Corporation, we have in evidence the returns filed by petitioner for Innisfail from 1926 through the taxable years, sworn to by petitioner. In my opinion neither the returns petitioner filed for the Innisfail Corporation nor his own presented information to inform the Government of what the true situation was. Petitioner has not, in his returns, dealt frankly with the Government and did not in his own returns give a revelation of all income he was receiving. *Charles E. Mitchell, supra.* Petitioner reported his income on a cash basis. He could not withhold from the Government information regarding income he received in any year under a plan whereby he intended to cancel out "income" in a later year by a device of bookkeeping debits and credits he expected to make later. There is so little plausibility in petitioner's theories about the transactions involved, which we are asked to accept on their face, that I can not believe that petitioner himself believed them but, rather, I believe he only expected that *others would be credulous.* When a lawyer, knowing legal requirements and normal and customary business procedures, deliberately and voluntarily builds up a superstructure that is not in fact what it is held out to be, there is no other conclusion to be drawn than that his underlying intent was fraudulent and deceitful.

The process of weighing evidence is a process of understanding the evidence. If, upon due and careful deliberation, the mind of the trier of the case emerges convinced that there was in the mind of the taxpayer a deceitful and fraudulent intent, then the decision must be against the protestations of innocence from the taxpayer. *L. Schepp Co.,* 25 B. T. A. 419.

Petitioner possessed large assets in cash and securities in 1926 and in subsequent years. He could easily have contributed to his wholly owned corporation working capital; he could easily have permitted Innisfail to own and control its assets, receive income therefrom, and carry on a corporate business in the true sense. He could have done with exactness and fidelity all the things which he now protests he did but, which the facts show, were not done, i. e., convey to Innisfail title to stocks and lend to and borrow from his corporation. Very easily, he could have done all the above; directed dividends to be paid into the Innisfail bank account; made real transfers of title.

424

There was, of course, never any practical reason for the existence, in fact, of *any debt* to or from Innisfail if it had owned stocks yielding income of as much as $80,000 a year. Only petitioner's evasion scheme provides any explanation for manipulating the debt. The failure to allow the Innisfail Corporation to function in a normal way in itself indicates lack of good faith. I find particularly unreal the detail of the purported cash dividend declared on Innisfail stock in 1928 of $70,000. The item was patently sham, a gesture to divert suspicion, perhaps, to give the appearance that the Innisfail Corporation was carrying on a bona fide corporate business. It is clear that petitioner made out his own income tax returns to fit the pattern of his bookkeeping transactions with Innisfail. The essence of the plan was to build up a "debt" of the corporation to petitioner through book entries to enable petitioner to retain dividends and to take losses on "sales" of stock under the guise of reducing the "debt," while at the same time retaining the stocks and dividends earned. In 1930, when the balance went the other way, petitioner then retained dividends as "loans" to him. None of this is plausible. Petitioner has nowhere shown any real business reason for "borrowing" from his corporation in 1930 and 1931, or at any other time.

Petitioner's tax evasion scheme reaches the enormity of his having achieved escape from taxation upon over $405,000 of income derived from dividends on domestic stocks during the period from 1926 through 1931.

The holding should be that the returns filed in the taxable years were false and fraudulent, with intent to evade taxation. Cf. *Robert Wilson Carter*, 36 B. T. A. 598; *M. Rea Gano*, 19 B. T. A. 518; *Charles E. Mitchell, supra.*

TURNER, HILL, KERN, and OPPER concur in the above dissent.